EUNICE BABCOCK ET AL. *v.* BRIDGEPORT HOSPITAL ET AL.

PHILIP BONAFFINI ET AL. *v.* BRIDGEPORT HOSPITAL ET AL.
(SC 16133)

Borden, Katz, Palmer, Sullivan and Peters, Js.

Argued September 28—officially released December 28, 1999

*Madonna A. Sacco*, with whom was *David J. Robertson*, for the appellants (defendants in both cases).

*J. Daniel Sagarin*, with whom, on the brief, were *Margaret E. Haering* and *Regina Duchin Kraus*, for the appellees (plaintiffs in each case).

*Patrick J. Fitzgerald III* filed a brief for the intervening appellees (James Clarke et al.).

*Beverly S. Knapp* and *L. Douglas Shrader* filed a brief for the intervening appellees (Ronald G. Cone et al.).

*Ernest F. Teitell* and *Brad C. Gustafson* filed a brief for the Connecticut Trial Lawyers Association as amicus curiae.

*Patrick J. Monahan II, Eileen R. Becker* and *Jennifer D. Jackson* filed a brief for the Connecticut Hospital Association, Inc., as amicus curiae.

*Opinion*

KATZ, J. This appeal presents the court with its first opportunity to address General Statutes §§ 19a-17b and 19a-25.[1] Specifically, we must consider the extent to

---

[1] General Statutes § 19a-17b provides: "Peer review: Definitions; immunity; discovery permissible re proceedings. (a) For the purposes of this section:

"(1) 'Health care provider' means any person, corporation, limited liability company, facility or institution operated, owned or licensed by this state to provide health care or professional services, or an officer, employee or agent thereof acting in the course and scope of his employment.

"(2) 'Peer review' means the procedure for evaluation by health care professionals of the quality and efficiency of services ordered or performed by other health care professionals, including practice analysis, inpatient hospital and extended care facility utilization review, medical audit, ambulatory care review and claims review.

"(3) 'Professional society' includes medical, psychological, nursing, dental, naturopathic, osteopathic, optometric, pharmaceutical, chiropractic, podiatric, physical therapy and occupational therapy organizations as well as individual practice associations as defined in Section 300e-1 (5) of the Public Health Service Act, 42 U.S.C. 300e-1 (5), as amended, having as members at least a majority of the eligible licentiates in the area or health care facility or agency served by the particular society or, in the case of physical therapy organizations, at least twenty-five per cent of the eligible licentiates in the state.

"(4) 'Medical review committee' shall include any committee of a state or local professional society or a committee of any health care institution established pursuant to written bylaws, and any utilization review committee established pursuant to Public Law 89-97, and a professional standards review organization or a state-wide professional standards review council, established pursuant to Public Law 92-603, engaging in peer review, to gather and review information relating to the care and treatment of patients for the purposes of (A) evaluating and improving the quality of health care rendered; (B) reducing morbidity or mortality; or (C) establishing and enforc-

which §§ 19a-17b and 19a-25 create statutory privileges

ing guidelines designed to keep within reasonable bounds the cost of health care. It shall also mean any hospital board or committee reviewing the professional qualifications or activities of its medical staff or applicants for admission thereto.

"(b) There shall be no monetary liability on the part of, and no cause of action for damages shall arise against, any person who provides testimony, information, records, documents, reports, proceedings, minutes or conclusions to any hospital, hospital medical staff, professional society, medical or dental school, professional licensing board or medical review committee when such communication is intended to aid in the evaluation of the qualifications, fitness or character of a health care provider and does not represent as true any matter not reasonably believed to be true.

"(c) There shall be no monetary liability on the part of, and no cause of action for damages shall arise against, any member of a medical review committee for any act or proceeding undertaken or performed within the scope of any such committee's functions provided that such member has taken action or made recommendations without malice and in the reasonable belief that the act or recommendation was warranted.

"(d) The proceedings of a medical review committee conducting a peer review shall not be subject to discovery or introduction into evidence in any civil action for or against a health care provider arising out of the matters which are subject to evaluation and review by such committee, and no person who was in attendance at a meeting of such committee shall be permitted or required to testify in any such civil action as to the content of such proceedings; provided the provisions of this subsection shall not preclude (1) in any civil action, the use of any writing which was recorded independently of such proceedings; (2) in any civil action, the testimony of any person concerning the facts which formed the basis for the institution of such proceedings of which he had personal knowledge acquired independently of such proceedings; (3) in any health care provider proceedings concerning the termination or restriction of staff privileges, other than peer review, the use of data discussed or developed during peer review proceedings; or (4) in any civil action, disclosure of the fact that staff privileges were terminated or restricted, including the specific restriction imposed, if any."

General Statutes § 19a-25 provides: "Confidentiality of records procured by the Department of Public Health or directors of health of towns, cities or boroughs. All information, records of interviews, written reports, statements, notes, memoranda or other data, including personal data as defined in subdivision (9) of section 4-190, procured by the Department of Public Health or by staff committees of facilities accredited by the Department of Public Health in connection with studies of morbidity and mortality conducted by the Department of Public Health or such staff committees, or carried on by said department or such staff committees jointly with other persons, agencies or organizations, or procured by the directors of health

for the nondisclosure of medical records to a tort claimant. We must determine what information relating to medical peer reviews and hospital morbidity studies these statutes shelter from disclosure and what burdens of proof must be assumed by those who seek to avail themselves of the privilege.

The cumbersome record discloses the following undisputed facts. In July, 1998, the plaintiffs, Eunice Babcock and Keith Babcock, and Gloria Bonaffini and Philip Bonaffini, filed these separate actions seeking damages alleging that the defendants, Bridgeport Hospital (hospital) and its parent company, Southern Connecticut Health Systems, had been negligent and

of towns, cities or boroughs or the Department of Public Health pursuant to section 19a-215, or procured by such other persons, agencies or organizations, for the purpose of reducing the morbidity or mortality from any cause or condition, shall be confidential and shall be used solely for the purposes of medical or scientific research and, for information obtained pursuant to section 19a-215, disease prevention and control by the local director of health and the Department of Public Health. Such information, records, reports, statements, notes, memoranda or other data shall not be admissible as evidence in any action of any kind in any court or before any other tribunal, board, agency or person, nor shall it be exhibited or its contents disclosed in any way, in whole or in part, by any officer or representative of the Department of Public Health or of any such facility, by any person participating in such a research project or by any other person, except as may be necessary for the purpose of furthering the research project to which it relates. Notwithstanding the provisions of chapter 55, the Department of Public Health may exchange personal data for the purpose of medical or scientific research, with any other governmental agency or private research organization; provided such state, governmental agency or private research organization shall not further disclose such personal data. The Commissioner of Public Health shall adopt regulations consistent with the purposes of this section to establish the procedures to ensure the confidentiality of such disclosures. The furnishing of such information to the Department of Public Health or its authorized representative, or to any other agency cooperating in such a research project, shall not subject any person, hospital, sanitarium, rest home, nursing home or other person or agency furnishing such information to any action for damages or other relief because of such disclosure. This section shall not be deemed to affect disclosure of regular hospital and medical records made in the course of the regular notation of the care and treatment of any patient, but only records or notations by such staff committees pursuant to their work."

reckless and had acted in violation of the Connecticut Unfair Trade Practices Act.[2] Specifically, the complaints in both actions alleged, inter alia, that there had been an epidemic of methicillin-resistant staphylococcus aureus (MRSA) infection in the hospital, that the defendants had failed to prevent its spread and that they had conspired to cover up the epidemic. In their complaint, the Babcocks alleged that during her hospitalization, Eunice Babcock was infected by both MRSA and vancomycin-resistant enterococcus (VRE), causing her to undergo multiple surgeries and suffer serious permanent injuries. In their complaint, the Bonaffinis alleged that Gloria Bonaffini suffered severe illness, injuries and disabilities due to the MRSA infection, including multiple surgical procedures, amputation of her left foot, a tracheostomy and a colostomy, ultimately leading to her death.

On August 5, 1998, the plaintiffs filed a notice of deposition and production request directed to the hospital's "Infection Control Officer."[3] The plaintiffs also filed

[2] See General Statutes § 42-110a et seq.

[3] Specifically, the plaintiffs made the following production requests:

"SCHEDULE A

"1. Any and all documents, including but not limited to reports and computer printouts, which reflect, pertain to and/or report the colonization rate of MRSA at Bridgeport Hospital from November 1995 through December 1997.

"2. Any and all documents prepared by the Infection Control officer at Bridgeport Hospital, including but not limited to computer printouts of the lab test data gathered and/or reviewed by the Infection Control officer that reflect, pertain to, and/or report findings regarding colonization rates of MRSA at Bridgeport Hospital, including but not limited to those documents that formed the basis for such findings, during the period December 1995 through December 1997.

"3. Any and all documents that set forth, refer to, reflect and/or pertain to policies and procedures regarding the manner and frequency that colonization rates were calculated and reviewed at Bridgeport Hospital prior to November 1996.

"4. Any and all documents that set forth, refer to, reflect and/or pertain to policies and procedures regarding the manner and frequency that colonization rates are calculated and reviewed at Bridgeport Hospital since November 1996.

a notice of deposition and production request directed to Michael Liebowitz, Bridgeport Hospital's risk manager, and to Karen Hoffer, clinical services manager of Bridgeport Hospital. The defendants moved for a protective order, asserting that the requested material was protected from disclosure by §§ 19a-17b and 19a-25.[4] Additionally, the plaintiffs filed their first set of interrogatories and accompanying requests for production to which the defendants objected, asserting essentially the same privileges.[5]

"5. Any and all documents that set forth, refer to, reflect and/or pertain to the culturing of medical personnel at Bridgeport Hospital in response to the outbreak of MRSA infection in Bridgeport Hospital from December 1996 through December 1997.

"6. Any and all documents that set forth, pertain to, refer to and/or reflect the threshold colonization rate relied on at Bridgeport Hospital for determining whether an epidemic of an infectious disease is developing or has developed.

"7. Any and all documents which set forth, pertain to, refer and/or reflect any change in the threshold colonization rate relied on at Bridgeport Hospital for determining whether an epidemic of an infectious disease is developing or has developed.

"8. Any and all documents which set forth, pertain to, refer and/or reflect policies and procedures regarding the frequency that colonization rates are reviewed and/or calculated at Bridgeport Hospital, including the manner and basis of such calculations."

[4] Although the defendants moved for protective orders as to the document requests in conjunction with all three depositions, they did not offer affidavits from Liebowitz or Hoffer in support of their claims of privilege. See footnote 7 of this opinion.

[5] The pertinent interrogatories and request for production along with the defendants' objections thereto are as follows:

"A. INTERROGATORIES

* * *

"5. Please state whether there was an outbreak of Methicillin-Resistant Staphylococcus Aureus ("MRSA") infection at Bridgeport Hospital in 1996-1997. If the answer to this interrogatory is in the affirmative, please state the following:

"(a) the date the first patient at Bridgeport Hospital became infected with MRSA during that time period;

"(b) the date when Bridgeport Hospital first became aware of such infection;

"(c) the manner in which Bridgeport Hospital became aware of such infection;

"(d) the individuals, by name and position, charged with the responsibility of the Hospital's response, including but not limited to preventing the spread of and containing such outbreak, to such infection.

"OBJECTION: It is objected to insofar as it seeks information, privileged by the peer review statute and Connecticut General Statutes § 19a-25, seeks information concerning other patients which is confidential, seeks information privileged by the attorney/client relationship and seeks information prepared in anticipation of litigation.

"6. Please state whether Bridgeport Hospital has policies and procedures in place which pertain to, refer and/or relate to its response to an outbreak of an infectious disease such as MRSA. If the answer to this Interrogatory is in the affirmative, please identify the following:

"(a) the date such policies and procedures were adopted;

"(b) the individual(s) and/or entity, by name and position responsible for drafting such polices and procedures;

"(c) whether amendments have been made to such policies and procedures, including in your answer the dates of and reasons for any such amendments;

"(d) the individual(s) and/or entity responsible for monitoring compliance with such policies and procedures;

"(e) the manner in which compliance with such policies and procedures is monitored;

"(f) what administrative response(s) are in place to address noncompliance with such policies and procedures.

"OBJECTION: It is objected to insofar as it seeks information which is privileged information protected by the peer review statute and Connecticut General Statutes § 19a-25, and seeks information which is overly broad, unduly burdensome, seeks immaterial information not calculated to lead to the discovery of admissible evidence or exceeds the scope of discovery.

"7. Please state whether any employees of Bridgeport Hospital were provided instruction, directly or indirectly, regarding their responses to inquiries by family members of patients with MRSA infection regarding such patients' condition. If the answer to this Interrogatory is in the affirmative, please state:

"(a) the substance of such instruction;

"(b) the reason(s) for such instruction;

"(c) the individual(s)/entity, by name and position, whose decision it was to so instruct such employees.

"OBJECTION: (a-c) It is objected to insofar as it seeks information privileged by the peer review statute and Connecticut General Statutes § 19a-25 and seeks information prepared in anticipation of litigation.

"8. Please identify the current Director of Risk Management at Bridgeport Hospital, including in your answer the date he/she became Risk Manager. In addition, please state:

"ANSWER: Mr. Michael Liebowitz has been Director of Risk Management since (date)

"(a) whether the individual so identified was the Risk Manager at the

time that patients at Bridgeport Hospital developed Methicillin-Resistant Staphylococcus Aureus ("MRSA") infection in 1996-1997;

"ANSWER: Mr. Michael Liebowitz has been the Risk Manager from (date) to the present.

"(b) when the Risk Manager identified above was first apprised of the development of such MRSA infections at Bridgeport Hospital;

"OBJECTION: It is objected to insofar as it seeks information privileged by the peer review statute and Connecticut General Statutes § 19a-25, and seeks information which was prepared in anticipation of litigation.

"(c) whether he had direct contract with patients who had contracted MRSA infection in 1996 and 1997 at Bridgeport Hospital;

"(d) the reason(s) for such contact;

"(e) whether he had contact with family members of patients who had contracted MRSA infection in 1996 and 1997 at Bridgeport Hospital. If your answer to this Interrogatory is in the affirmative, please identify the following:

"(i) the names of each such family member with whom he had contact; and,

"(ii) the reason(s) for such contact.

"(f) if an individual or entity other than, or in addition to, the Risk Manager instituted such instruction or was involved in the decision to institute such instruction, please identify by name/entity and position each such individual or entity; and

"(g) whether the Risk Manager had contact and/or communication with Southern Connecticut Health System, Inc. regarding the development of MRSA infection at Bridgeport Hospital in 1996–97. If your answer to the Interrogatory is in the affirmative, please identify by name and position, the individual(s) at Southern Connecticut Health Systems, Inc., so contacted and the purpose of each such contact and/or communication;

"OBJECTION: (a–g) It is objected to insofar as it is vague as it does not clearly define contact, seeks information protected by the peer review privilege and Connecticut General Statutes § 19a-25, seeks information which is confidential as it relates to other patients and seeks information which is prepared in anticipation of litigation.

"9. Please identify the individual(s) charged with decision-making authority regarding when contact and barrier precautions are to be instituted in response to an outbreak of infectious disease at Bridgeport Hospital since November 1996, including in your answer the following:

"(a) the name and position of the individual(s) who instituted contact and barrier precautions at Bridgeport Hospital in response to the outbreak of MRSA infection in 1996–1997;

"(b) the basis for instituting such contact and barrier precautions;

"(c) the date such contact and barrier precautions were instituted; and,

"(d) the individual(s) responsible for instituting and monitoring compliance with such contact and barrier precautions;

"(e) the manner in which compliance is monitored;

"(f) whether there were administrative and/or employment responses,

including but not limited to penalties of any type, to address or remedy any non-compliance;

"(g) whether any such administrative and/or employment responses were directed to any physicians, hospital personnel, staff or department. If the answer to this Interrogatory is in the affirmative please identify the following:

"(i) the name and position of any and all individuals/ departments toward whom such responses were directed;

"(ii) the nature and type of such responses;

"(iii) the date of each such response identified; and,

"(iv) the specific reason each such response was made.

"OBJECTION: (a–g) It is objected to insofar as it seeks information privileged and protected by the peer review statute and the Connecticut General Statutes § 19a-25, seeks irrelevant information and seeks information which was prepared in anticipation of litigation.

"10. Please state whether Bridgeport Hospital has an infection control team or an equivalent team or group. If the answer to this Interrogatory is in the affirmative, please identify by name, specific position and date the individuals who were on such team during the period November 1995 through December 1997.

"OBJECTION: It is objected to insofar as it seeks information protected by the peer review statute and Connecticut General Statutes § 19a-25.

"11. Please identify by name and position the individual(s) charged with gathering daily laboratory data for the purpose of monitoring colonization rates at Bridgeport Hospital during the period November 1995 through December 1997.

"OBJECTION: It is objected to insofar as it seeks information protected by the peer review statute and Connecticut General Statutes § 19a-25.

"12. Please identify the source(s) of laboratory data (e.g., urine, skin, wounds, etc.) reviewed for the purpose of calculating colonization rates at Bridgeport Hospital during the period November 1995 through December 1997, including in your answer the location in the Hospital . . . of patients from whose test results such data is obtained and calculated.

"OBJECTION: It is objected to insofar as it seeks information protected by the peer review statute and Connecticut General Statutes § 19a-25 and seeks information concerning other patients which is confidential pursuant to the statute.

"13. Please identify the threshold utilized by Bridgeport Hospital in 1996 and 1997 with respect to which a determination is made regarding whether an infectious epidemic is developing.

"OBJECTION: See objection to Interrogatory No. 11.

"14. Please state whether any external and/or internal investigations were conducted as a result of the MRSA infection that developed at Bridgeport Hospital. If the answer to this Interrogatory is in the affirmative, please identify the following:

"(a) the individual(s) who conducted each such investigation, by name and position.

"(b) the date, purpose and result of each investigation.

"(c) any and all actions taken based on such investigation(s) identified.

"OBJECTION: (a–c) It is objected to insofar as it seeks information privileged by Connecticut's peer review statute and Connecticut General Statutes § 19a-25, seeks information prepared in anticipation of litigation and seeks information protected by the attorney/client relationship.

"15. Please state whether any matter relating to MRSA infection that patients developed at Bridgeport Hospital in 1996-1997 was the subject of peer review. If the answer to the Interrogatory is in the affirmative, please identify the following:

"(a) the matter which was the subject of such review;

"(b) the date(s) such matter was the subject of such review;

"(c) whether any recommendation and/or actions were taken as a result of such peer review.

"OBJECTION: (a–c) It is objected to insofar as it seeks information protected by the peer review statute and Connecticut General Statutes § 19a-25.

"16. Please state whether any matter relating to MRSA infection that patients developed at Bridgeport Hospital in 1996-1997 was the subject of an administrative review. If the answer to this Interrogatory is in the affirmative, please identify the following:

"(a) the matter which was the subject of such review;

"(b) the date(s) such matter was the subject of such review;

"(c) whether any recommendation and/or actions were taken as a result of such an administrative review.

"OBJECTION: (a–c) It is objected to insofar as it seeks irrelevant information, seeks information protected by the peer review statute and seeks information protected by Connecticut General Statutes § 19a-25.

"17. Please state whether Bridgeport Hospital medical personnel, including private physicians and house staff, were cultured in 1997 in response to an outbreak of MRSA infection at the Hospital. If the answer to this Interrogatory is in the affirmative, please identify the following:

"(a) the personnel by name and position who were cultured;

"(b) the date(s) such cultures were taken;

"(c) the results of each such culture taken;

"(d) Bridgeport Hospital's response to the results of such cultures.

"OBJECTION: (a–d) It is objected to insofar as it seeks irrelevant information, seeks information of a confidential nature concerning the medical records of the personnel, seeks information protected by Connecticut peer review statute and seeks information protected by Connecticut General Statutes § 19a-25.

"B. REQUESTS FOR PRODUCTION

"1. Any and all documents, including but not limited to memos, correspondence, notes, regarding intracorporate and intercorporate communicating and decision making by and between the Defendants in this matter insofar as such communication and decision-making pertains to, relates to and/or references outbreaks of infection of MRSA at Bridgeport Hospital during the period November 1996 through the present.

"OBJECTION: It is objected to insofar as it is not limited in time, seeks information protected by the attorney/client relationship, seeks information prepared in anticipation of litigation and seeks information protected by Connecticut's peer review statute and Connecticut General Statutes § 19a-25.

"2. Any and all documents from Bridgeport Hospital's Department of Infectious Diseases, including but not limited to records, reports, incident reports, notes, memoranda and correspondence, insofar as such documents pertain to, relate to, reflect and/or reference an outbreak of MRSA infection at Bridgeport Hospital during the period November 1996 through December 1997.

"OBJECTION: See objection to Request for Production No. 1.

"3. Any and all documents from Bridgeport Hospital's Department of Infectious Diseases which set forth the policies and procedures in place for the period 1991 through November 1996 to prevent and/or respond to MRSA infection at Bridgeport Hospital.

"OBJECTION: It is objected to insofar as it is beyond any relevant time period, seeks material privileged by Connecticut's peer review statute and Connecticut General Statutes § 19a-25.

"4. Any and all documents from Bridgeport Hospital's Department of Infectious Diseases which set forth policies and procedures in place from December 1996 to prevent and/or respond to MRSA infection at Bridgeport Hospital.

"OBJECTION: It is objected to insofar as it seeks material privileged by Connecticut's peer review statute and Connecticut General Statutes § 19a-25 and its scope is beyond any relevant time frame.

"5. Any and all documents which set forth, pertain to, relate to, reflect and/or reference in the manner in which decisions are generally made at Bridgeport Hospital regarding the prevention of and response to infectious disease, including but not limited to documents which identify the person(s) and their respective positions at Bridgeport Hospital who are charged with making such decisions and the bases on which such persons rely for making such decisions.

"OBJECTION: It is objected to insofar as it is not limited in time, seeks information protected by the attorney/client relationship, seeks information prepared in anticipation of litigation and seeks information protected by Connecticut's General Statutes § 19a-25 and is beyond any relevant time frame.

"6. Any and all documents which set forth, pertain to, relate to, reflect and/or reference the manner in which decisions were made at Bridgeport Hospital regarding response to the MRSA infection that developed at Bridgeport Hospital in 1996–1997, including but not limited to documents which identify the person(s) and their respective positions at Bridgeport Hospital who were charged with making such decisions, the bases on which such persons relied for making such decisions and documents which set forth, pertain to, relate to, reflect and/or reference such decision(s).

"OBJECTION: See objection to Production Request No. 1.

"7. Any and all documents created or issued by and/or received by Bridgeport Hospital's Department of Risk Management, including but not limited to records, reports, incidents reports, notes, memoranda and correspondence, insofar as such documents pertain to, relate to, reflect and/or reference the outbreak of MRSA infection at Bridgeport Hospital during the period November 1996 through December 1997.

"OBJECTION: See objection to Production Request No. 1.

"8. Any and all documents, including but not limited to reports and computer printouts, which reflect, pertain to and/or report the colonization rate of MRSA at Bridgeport Hospital from November 1995 through December 1997.

"OBJECTION: See objection to Production Request No. 1.

"9. Any and all documents prepared by the Infection Control officer at Bridgeport Hospital, including but not limited to computer printouts of the lab test data gathered and/or reviewed by the Infection Control officer that reflect, pertain to, and/or report findings regarding colonization rates of MRSA at Bridgeport Hospital, including but not limited to those documents that formed the basis for such findings, during the period December 1995 through December 1997.

"OBJECTION: See objection to Production Request No. 1.

"10. Any and all documents that set forth, refer to, reflect and/or pertain to policies and procedures regarding the manner and frequency that colonization rates were calculated and reviewed at Bridgeport Hospital prior to November 1996.

"OBJECTION: See objection to Production Request No. 1.

"11. Any and all documents that set forth, refer to, reflect and/or pertain to policies and procedures regarding the manner and frequency that colonization rates are calculated and reviewed at Bridgeport Hospital since November 1996.

"OBJECTION: See objection to Production Request No. 1.

"12. Any and all documents that set forth, refer to, reflect and/or pertain to the culturing of medical personnel at Bridgeport Hospital in response to the outbreak of MRSA infection in Bridgeport Hospital from December 1996 through December 1997.

"OBJECTION: It is objected to insofar as it seeks confidential information relating to the medical reports of personnel, seeks information protected by the peer review statute and Connecticut General Statutes § 19a-25.

"13. Any and all documents that set forth, pertain to, refer to and/or reflect the threshold colonization rate relied on at Bridgeport Hospital for determining whether an epidemic of an infectious disease is developed or has developed.

"OBJECTION: It is objection to insofar as it is not limited in time, seeks information protected by the peer review statute and Connecticut General Statutes § 19a-25 and seeks information prepared in anticipation of litigation.

"14. Any and all which set forth, pertain to, refer and/or reflect any change in the threshold colonization rate relied on at Bridgeport Hospital for determining whether an epidemic of an infectious disease is developed

In December, 1998, the case was transferred to the Complex Litigation Docket. Thereafter, in January, 1999, the plaintiffs served supplemental interrogatories and production requests, seeking additional data and records relating to infection control at the hospital. The plaintiffs also filed an opposition to the defendants' requests for a protective order, challenging the defendants' assertions of statutory privilege to both the plaintiffs' first set of interrogatories and requests for production, and to the production request that accompanied their notice of deposition. In support of their opposition, the plaintiffs argued that the defendants had failed to make the evidentiary showing needed to establish the existence of either statutory privilege.

Thereafter, the defendants objected to the plaintiffs' supplemental discovery request, asserting, inter alia, that the information requested also was protected by §§ 19a-17b and 19a-25.[6] Following a scheduling confer-

---

or has developed.

"OBJECTION: See objection to Production Request No. 13.

"15. Any and all documents which set forth, pertain to, refer and/or reflect policies and procedures regarding the frequency that colonization rates are reviewed and/or calculated at Bridgeport Hospital, including the manner and basis of such calculations.

"OBJECTION: See objection to Production Request No. 13.

"16. Any and all documents, including but not limited to written policies and procedures, which set forth, pertain to, refer and/or reflect special precautions that Bridgeport Hospital takes or recommends with respect to high-risk patients in the face of a potential and/or actual epidemic of infectious disease at the Hospital.

"OBJECTION: See objection to Production Request No. 13.

"17. Documents which set forth the organizational chart for Bridgeport Hospital, Inc. and Southern Connecticut Health Systems, Inc.

"18. Any and all documents relied on and/or referred to in responding to Interrogatories 1–17.

"OBJECTION: See corresponding objections to Interrogatories 1–17."

[6] The plaintiffs' supplemental discovery request and the defendants' objections thereto were as follows:

"OBJECTIONS TO PLAINTIFFS' SUPPLEMENTAL
INTERROGATORIES AND REQUESTS FOR PRODUCTION . . .
"A. INTERROGATORIES . . .

"2. As to each individual named in response to Interrogatory No. 1, state

ence on February 24, 1999, the defendants submitted,

whether to your knowledge, or the knowledge of your attorney, such individual has given any statement or statements as defined in the Connecticut Practice Book § 13-1 concerning the subject matter of the complaint in this lawsuit.

"OBJECTION: . . . In addition, seeks information prohibited by the peer review statute. . . .

"5. As to each individual named in response to Interrogatory No. 4, state whether to your knowledge, or the knowledge of your attorney, such individual has given any statement or statements as defined in the Connecticut Practice Book § 13-1 concerning the subject matter of the complaint in this lawsuit.

"OBJECTION: It is objected to insofar as it seeks information which is overly broad, not limited in time and seeks information not calculated to lead to the discovery of admissible evidence and seeks information which is privileged information protected by the peer review statute and Connecticut General Statutes § 19a-25.

"6. If your answer to Interrogatory No. 5 is affirmative, please state:

"(a) the date on which the statement or statements were taken;

"(b) the names and addresses of the person or persons who took such statement or statements;

"(c) the names and addresses of any person present when such statement or statements were taken;

"(d) whether such statement or statements were written, made by recording device or taken by court reporter or stenographer; and

"(e) the names and addresses of each person having custody or a copy of copies of such statement or statements.

"OBJECTION: (a–e) See objection to Interrogatory No. 5. . . .

"8. Please identify, by month and year, the number of patients at Bridgeport Hospital who contracted Methicillin-Resistant Staphylococcus Aureus ("MRSA") infection during the period December 1995 through the present.

"OBJECTION: It is objected to insofar as it seeks information which is privileged information protected by the Peer Review Statute and Connecticut General Statutes § 19a-25 as well as information which is confidential information protected by the physician/patient relationship.

"9. Please state whether any incident reports were prepared and/or filed at Bridgeport Hospital during the period November, 1996, through December, 1997, arising out of, related to, pertaining to, reflecting and/or referencing MRSA infections and/or infection control at Bridgeport Hospital.

"OBJECTION: It is objected to insofar as it seeks information which is privileged information protected by the Peer Review Statute and Connecticut General Statutes § 19a-25, seeks information not calculated to lead to the discovery of admissible evidence and seeks information prepared in anticipation of litigation.

"10. If your answer to Interrogatory No. 9 is in the affirmative, please state:

"(a) the date on which the incident which was the subject of each report

pursuant to a court order, a memorandum of law in

identified occurred;

"(b) the nature of each such incident identified;

"(c) the date on which each such incident report was prepared and/or filed;

"(d) the name, address and job title of each individual who was the subject of each such incident report;

"(e) the name, address and job title of each individual who reported the incident that became the subject of each such incident report;

"(f) the name and job title of each individual who prepared and/or file each such incident report; and

"(g) the name and address of each individual having custody or copy of each such incident report.

"OBJECTION: (a–g) See objection to Interrogatory No. 9.

"11. Please state whether any grievances were prepared and/or filed by any employees or professional staff, including but not limited to physicians, at Bridgeport Hospital during the period November, 1996, through December, 1997, arising out of, related to, pertaining to, reflecting and/or referencing MRSA infections and/or infection control at Bridgeport Hospital.

"OBJECTION: It is objected to insofar as it seeks information which is privileged information protected by the Peer Review Statute and Connecticut General Statutes § 19a-25.

"12. If your answer to Interrogatory No. 11 is in the affirmative, please state:

"(a) the date on which the incident or issue which was the subject of each such grievance report identified occurred;

"(b) the nature of such grievance identified;

"(c) the date on which each such grievance was prepared and/or filed;

"(d) the name and job title of each individual who was the subject of each such grievance;

"(e) the name and job title of each individual who reported the grievance;

"(f) the name and job title of each individual who prepared and/or filed each such grievance; and

"(g) the name and address of each person having custody or a copy of each such grievance.

"OBJECTION: (a–g) See objection to Interrogatory No. 11.

"13. Please state whether any bacterial isolates from blood, sputum, wound and/or urine samples analyzed by the pathology laboratory at Bridgeport Hospital during the period November, 1996, through June, 1997, have been preserved, maintained and/or stored. If the answer to this Interrogatory is in the affirmative, please state the following:

"(a) the reason such isolates were preserved, maintained and/or stored;

"(b) whether it is the policy and practice of Bridgeport Hospital pathology laboratory to preserve, maintain and/or store such isolates;

"(c) the type of bacterial isolates what were so preserved maintained and/or stored;

"(d) the current location of such bacterial isolates.

"OBJECTION: (a–d) See objection to Interrogatory No. 11. Further, seeks

reply to the plaintiffs' opposition to their motion for a

information which is confidential between the patient and the defendant.

"14. Please state whether any bacterial isolates from blood, sputum, wound and/or urine samples analyzed by the pathology laboratory at Bridgeport Hospital during the period November, 1996, through June, 1997, were sent to any other laboratory or facility for analysis. If the answer to this Interrogatory is in the affirmative, please state the following:

"(a) the basis for the decision to send such isolates to such other laboratory or facility;

"(b) whether it is the policy and practice of Bridgeport Hospital pathology laboratory to send such isolates to such other laboratory or facility;

"(c) the type of bacterial isolates that were so sent;

"(d) the name and address of each such laboratory or facility where the isolates were sent; and,

"(e) the current location of such bacterial isolates.

"OBJECTION: (a–e) See objection to Interrogatory No. 11.
* * *

"B. REQUESTS FOR PRODUCTION

"1. Copies of any and all Practice Book § 13-1 statements referenced in Interrogatories 2 and 5.

"OBJECTION: See objection to Interrogatories 2 and 5. . . .

"3. Copies of medical records of all patients at Bridgeport Hospital during the period November, 1996, through December, 1997, whom contracted Methicillin-Resistant Staphylococcus Aureus ("MRSA") infection at Bridgeport Hospital.

"OBJECTION: It is objected to insofar as it seeks records and information of a confidential nature which is protected by the patient/physician relationship and seeks confidential information which is protected by Connecticut General Statutes § 19a-25 and the peer review statute.

"4. Copies of any and all incident reports referenced in Interrogatory No. 9.

"OBJECTION: See objection to Interrogatory No. 9

"5. Copies of any and all grievances referenced in Interrogatory No. 11.

"OBJECTION: See objection to Interrogatory No. 11.

"6. Original samples of the bacterial isolates referenced in Interrogatory No. 13.

"OBJECTION: See objection to Interrogatory No. 11 and the defendant may not provide original samples as said records must be maintained for a mandated period of time as referenced in the Connecticut General Statutes. Seeks information which includes confidential patient information.

"7. Original samples of the bacterial isolates referenced in Interrogatory No. 14.

"OBJECTION: See objection to Interrogatory No. 11 and the defendant may not provide original samples as said records must be maintained for a mandated period of time as referenced in the Connecticut General Statutes. Seeks information which includes confidential patient information. . . .

"12. Copies of any and all documents relied on and/or referred to in

protective order. As part of their reply, the defendants included the affidavit of David Baker, a physician and a member of the hospital's infection control committee.[7] In addition, the defendants argued in their reply that when they first filed their motion for a protective order, an evidentiary hearing would have been premature, and that should the court determine that such a hearing is required, the defendants would be able to support the claim of privilege by testimony or additional affidavit. The record does not reflect that the defendants

responding to Interrogatories 1–23.

"OBJECTION: See various objections to Interrogatories 1 through 23. Overly broad, unduly burdensome, seeks irrelevant and immaterial information not calculated to lead to the discovery of admissible evidence, and exceeds the scope of discovery."

[7] Baker's affidavit provides the following: "The undersigned having been duly sworn hereby deposes and states:

"1. I am over the age of eighteen years and understand the obligations of an oath.

"2. The matters contained herein are true to the best of my knowledge and belief.

"3. Bridgeport Hospital is a facility licensed by this state to provide health care and/or professional services.

"4. I am a member of the Infection Control Committee, which is a committee of Bridgeport Hospital, a health care institution, established pursuant to Bridgeport Hospital's written bylaws.

"5. The Infection Control Committee engages in peer review, to gather and review information relating to the care and treatment of patients for the purposes of evaluating and improving the quality of health care rendered, reducing the morbidity and mortality rate and establishing and enforcing guidelines designed to keep within reasonable bounds the cost of health care.

"6. A review of the documents requested in Schedule A of the attached notice of deposition indicates, in my opinion that said documents were formulated and created by the Infection Control Committee or for the Infection Control Committee and are an integral part of the Infection Control Committee, a medical review committee created under the bylaws of Bridgeport Hospital.

"7. The documents requested in Schedule A of the aforementioned notice of deposition were utilized by the Infection Control Committee during its regularly scheduled meetings at Bridgeport Hospital.

"8. The documents requested were initiated, prepared, created or generated documents pursuant to the Infection Control Committee.

"9. The Infection Control Committee meets for regularly scheduled meetings once per month."

requested an evidentiary hearing.[8] Thereafter, on March 15, 1999, the plaintiffs sought an adjudication of the discovery issues. On March 17, 1999, the defendants objected to that request insofar as it pertained to the plaintiffs' two sets of interrogatories and requests for production.[9]

On March 19, 1999, the trial court issued the following order in response to the most recent pleadings: "At the case management conference conducted on [February 24, 1999] the parties were advised to take all steps necessary for adjudication of pending discovery disputes. The [hospital] did not file its brief in support of its objections to the plaintiffs' interrogatories but now claims that the objections should not be adjudicated because it has failed to file its brief. Any brief shall be filed on or before March 30, 1999. The [hopsital] shall by that date file a 'privilege log' listing any document claimed to be privileged or exempt from disclosure by virtue of any statute. As to each item claimed to be privileged, the defendant shall list what the claimed source of the privilege or exemption [is]. If the [hospital] fails to comply, the court will rule on the issues on the state of the submissions and will not revisit the issues."

Thereafter, the defendants filed a motion for articulation as to the court's order. Protesting that at the February 24, 1999 conference the court had ordered the

---

[8] The defendants asserted at oral argument in this court that, when they filed their response to the plaintiffs' claims that they had failed to present evidence supporting the application of the statutory privileges, they had asked for an opportunity and offered to present evidence in the event that the court found either that: (1) on their face, the requests asked for privileged documents; or (2) the affidavit was insufficient to establish that the privileges applied. Our review of the record does not support that assertion. Rather, the defendants indicated that should the court determine that some evidence in support of the privilege is required, they would provide "testimony or affidavit." When ordered by the court, at the scheduling conference, to respond to the plaintiffs' opposition to the defendants' motion for a protective order, the defendants submitted only the Baker affidavit.

[9] The defendants did not object to the plaintiffs' request for adjudication as it pertained to the notices of deposition.

defendants to reply to the plaintiffs' opposition to the motion for a protective order and that no orders had been entered relative to the objections to the interrogatories and requests for production, the defendants sought an additional thirty day time period within which to respond. The trial court extended the time period for the defendants to make their submissions until April 15, 1999, and reiterated that the defendants were to "comply with this court's *order* to file a privilege log listing each document claimed to be privileged and the legal basis for the privilege." (Emphasis in original.) The court added that, "[w]here the title of a document for which a privilege is claimed does not reveal its nature, that document shall be supplied to the court but not to the plaintiff(s) at this stage." Finally, the court emphasized that the defendants were to submit briefs on any objections to discovery by April 15, 1999, "or the objections will be decided on the basis of the briefs on file as of that date."

On April 15, 1999, the defendants filed a brief in support of their objections to the plaintiffs' requests for production of August, 1998, and January, 1999; see footnotes 5 and 6 of this opinion; adopting by reference the arguments they had made earlier. (See defendants' brief supporting motions for protective order concerning production of documents in connection with noticed depositions and their reply to plaintiffs' opposition to their motion for protective order.) Additionally, *as ordered*, the defendants submitted a privilege log to the court.[10] They did not submit any documents for in

[10] The following is the list of the items identified by the defendant in the privilege log. In the interest of brevity, we do not include the source of the privilege.

"PRIVILEGE LOG CREATED PURSUANT TO COURT ORDER

"1. Statistics Prepared subsequent to November of 1997 by Infection Control Committee of Coronary Artery Bypass Graft ('CABG') Procedures (October, 1997, and November, 1997) . . . .

"2. Graph Prepared subsequent to November of 1997 by Infection Control Committee of Sternal Wound Infections (January 1, 1995, through November 20, 1997) . . . .

"3. Graph Prepared subsequent to November of 1997 by Infection Control Committee of Sternal Wound Infections (January 1, 1995, through November 20, 1997) . . . .

"4. Minutes of Task Force Committee, a sub-committee created by Infection Control Committee (February 6, 1997, March 18, 1997, April 29, 1997, July 3, 1997, July 24, 1997, August 28, 1997, August 29, 1997, September 30, 1997, October 30, 1997) . . . .

"5. Statistics Prepared subsequent to September of 1997 by Infection Control Committee of CABG Procedures (August 1997, September 1997) . . . .

"6. Graph Prepared subsequent to September 1997 by Infection Control Committee of Sternal Wound Infections (January 1, 1995, through September 30, 1997) . . . .

"7. Graph Prepared subsequent to September, 1997, by Infection Control Committee of Sternal Wound Infections (January 1, 1995 through September 30, 1997) . . . .

"8. Statistics Prepared subsequent to September, 1997, by Infection Control Committee of Sternal Wound Infections (December 19, 1996, through September 30, 1997, and January 28, 1997 through September 30, 1997) . . . .

"9. Statistics Prepared by Infection Control Committee Subsequent to August 1997 of Sternal Wound Infections (December 17, 1996, through August 31, 1997, and January 16, 1997, through August 31, 1997) . . . .

"10. Graph Prepared Subsequent to August, 1997, by Infection Control Committee of Deep and Superficial Sternal Wound Infections Re: CABG Procedures (January 1, 1995, through August 31, 1997) . . . .

"11. Graph Prepared subsequent to August, 1997, by Infection Control Committee of Deep Sternal Wound Infections Re: CABG Procedures (January 1, 1995, through August 31, 1997) . . . .

"12. Flow check Prepared by Infection Control Committee on Infection Maintenance Re: Sternal Wound Infection (1995) . . . .

"13. Chronology Prepared by Infection Control Committee Subsequent to February, 1997 . . . .

"14. Infection Control summary of Events Prepared by Infection Control Committee (February 12, 1997) . . . .

"15. Chart Prepared by Infection Control Committee Subsequent to First Quarter of 1997 of Infection Rates by Category . . . .

"16. Chart Prepared Subsequent to First Quarter of 1997 by Infection Control Committee of Infection Rates by Category (1996 and 1997) . . . .

"17. Comparative Date Prepared Subsequent to January of 1997 by Infection Control Committee of Staph Aureus Isolates that are MRSA (October, 1996, through January, 1997) . . . .

"18. Yale-New Haven Hospital Epidemiology Laboratory Report Requested by and for Infection Control Committee (February 20, 1997) . . . .

"19. Chart Prepared by Infection Control Committee of MRSA Infections (February 21, 1997) . . . .

"20. Chart Prepared by Infection Control Committee of Infection Rates by Category (October 1996, November, 1996, and December, 1996) . . . .

"21. Document Prepared Subsequent to March 18, 1997, by Infection Control Committee of Investigation Re: Sternal Wound Infection Following CABG Procedures (January 3, 1997, through March 18, 1997) . . . .

"22. Graph Prepared Subsequent to May 31, 1997, by Infection Control Committee of Sternal Wound Infections (October 1, 1994, through May 31, 1997) . . . .

"23. Statistics Prepared Subsequent to December 31, 1996 by Infection Control Committee of Sternal Wound Infections (May 23, 1996 through December 31, 1996) . . . .

"24. Statistics Prepared Subsequent to January 31, 1997, by Infection Control Committee of Sternal Wound Infections (June 28, 1996, through January 31, 1997, and July 26, 1996, through January 31, 1997) . . . .

"25. Statistics Prepared Subsequent to February 28, 1997, by Infection Control Committee of Sternal Wounds (July 26, 1996, through February 28, 1997, and August 23, 1996, through February 28, 1997) . . . .

"26. Statistics Prepared Subsequent to March 31, 1997, by Infection Control Committee of Sternal Wound Infections (August 16, 1996, through March 31, 1997, and September 20, 1996, through March 31, 1997) . . . .

"27. Statistics Prepared Subsequent to April 30, 1997, by Infection Control Committee of Sternal Wound Infections (September 16, 1996, through April 30, 1997, and October 25, 1996, through April 30, 1997) . . . .

"28. Statistics Prepared Subsequent to May 31, 1997, by Infection Control Committee of Sternal Wound Infections (October 21, 1996, through May 31, 1997, and November 15, 1996, through May 31, 1997) . . . .

"29. Statistics Prepared Subsequent to July 31, 1997, by Infection Control Committee of Sternal Wound Infections (November 12, 1996, through June 30, 1997, and November 26, 1996, through July 31, 1997) . . . .

"30. Statistics Prepared Subsequent to July 31, 1997, by Infection Control Committee of Sternal Wound Infections (November 29, 1996, through June 30, 1997, and December 22, 1996, through July 31, 1997) . . . .

"31. Statistics Prepared Subsequent to August 31, 1997, by Infection Control Committee of Sternal Wound Infections (December 7, 1996, through August 31, 1997, and January 16, 1997, through August 31, 1997) . . . .

"32. Statistics Prepared Subsequent to September 30, 1997, by Infection Control Committee of Sternal Wound Infections (December 19, 1996, through September 30, 1997, and January 28, 1997, through September 30, 1997) . . . .

"33. Statistics Prepared Subsequent to November 30, 1997, by Infection Control Committee of Sternal Wound Infections (February 5, 1997, through November 30, 1997, and March 24, 1997, through November 30, 1997) . . . .

"34. Statistics Prepared Subsequent to December 31, 1997 by Infection Control Committee of Sternal Wound Infections (March 24, 1997, through December 31, 1997, and April 23, 1997, through December 31, 1997) . . .

"35. Statistics Prepared Subsequent to December of 1997 by Infection Control Committee of CABG Procedures (1996 and First Quarter of 1997) . . . .

"36. Statistics Prepared Subsequent to February of 1997 by Infection Control Committee of CABG Procedures (First Quarter 1997, January, 1997, and February, 1997) . . . .

"37. Statistics Prepared Subsequent to January of 1997 by Infection Control Committee of CABG Procedures (1996, First Quarter 1997 and January, 1997) . . . .

"38. Statistics Prepared Subsequent to March of 1997 by Infection Control Committee of CABG Procedures (Second Quarter 1997 and March, 1997) . . . .

"39. Statistics Prepared Subsequent to May of 1997 by Infection Control Committee of CABG Procedures (March, 1997, April, 1997, and May, 1997) . . . .

"40. Statistics Prepared Subsequent to July of 1997 by Infection Control Committee of CABG Procedures (June, 1997, and July, 1997) . . . .

"41. Statistics Prepared Subsequent to August, 1997, by Infection Control Committee of CABG Procedures (August, 1997) . . . .

"42. Statistics Prepared Subsequent to September, 1997, by Infection Control Committee of CABG Procedures (September, 1997) . . . .

"43. Statistics Prepared Subsequent to October, 1997, by Infection Control Committee of CABG Procedures (October, 1997) . . . .

"44. Statistics Prepared Subsequent to November of 1997 by Infection Control Committee of CABG Procedures (October, 1997, and November, 1997) . . . .

"45. Statistics Prepared Subsequent to December of 1997 by Infection Control Committee of CABG Procedures (December, 1997) . . . .

"46. Graph Prepared Subsequent to May 31, 1997, by Infection Control Committee of Sternal Wound Infections (October 1, 1994, through May 31, 1997) . . . .

"47. Graph Prepared Subsequent to July 31, 1997, by Infection Control Committee of Sternal Wound Infections (January 1, 1995, through July 31, 1997) . . . .

"48. Graph Prepared Subsequent to November 30, 1997, by Infection Control Committee of Sternal Wound Infections (January 1, 1995, through November 30, 1997) . . . .

"49. Graph Prepared Subsequent to February 28, 1997, by Infection Control Committee of Sternal Wound Infections (January 1, 1994, through February 28, 1997) . . . .

"50. Graph Prepared Subsequent to February 28, 1997, by Infection Control Committee of Sternal Wound Infections (January 1, 1994, through February 28, 1997) . . . .

"51. Graph Prepared Subsequent to March 31, 1997, by Infection Control Committee of Sternal Wound Infections (January 1, 1994, through March 31, 1997) . . . .

"52. Graph Prepared Subsequent to March 31, 1997, by Infection Control Committee of Sternal Wound Infections (January 1, 1994, through March 31, 1997) . . . .

"53. Graph Prepared Subsequent to May 31, 1997, by Infection Control

Committee of Sternal Wound Infections (October 1, 1994, through May 31, 1997) . . . .

"54. Graph Prepared Subsequent to July 31, 1997, by Infection Control Committee of Sternal Wound Infections (January 1, 1995, through July 31, 1997) . . . .

"55. Graph Prepared Subsequent to August 31, 1997, by Infection Control Committee of Sternal Wound Infections (January 1, 1995, through August 31, 1997) . . . .

"56. Graph Prepared Subsequent to August 31, 1997, by Infection Control Committee of Sternal Wound Infections (January 1, 1995, through August 31, 1997) . . . .

"57. Graph Prepared Subsequent to August 30, 1997, by Infection Control Committee of Sternal Wound Infections (January 1, 1995, through November 30, 1997) . . . .

"58. Graph Prepared Subsequent to November 30, 1997, by Infection Control Committee of Sternal Wound Infections (January 1, 1995, through November 30, 1997) . . . .

"59. Letter to Infection Control Committee by Member of Infection Control Committee (July 30, 1997) . . . .

"60. Summary Prepared by Infection Control Committee of Sternal and Leg/Groin Post CABG Infections (October 1, 1996, through June 30, 1997) . . . .

"61. Statistics of Sternal Wound Infections Prepared by Infection Control Committee (1997) . . . .

"62. Statistics of Sternal and Leg/Groin Infections Prepared by Infection Control Committee for 1997 . . . .

"63. Statistics Prepared Subsequent to May 31, 1997, by Infection Control Committee of Sternal Wound Infections (1997) . . . .

"64. Statistics Prepared Subsequent to May 31, 1997 by Infection Control Committee of Sternal Wound Infections (September 20, 1996, through March 31, 1997, October 25, 1996, through April 30, 1997, and November 15, 1996, through May 31, 1997) . . . .

"65. Graph Prepared by Infection Control Committee of CABG Procedures (1991 through 1996) . . . .

"66. Memorandum Prepared by Infection Control Committee for Task Force Subcommittee (February 4, 1997) . . . .

"67. Statistics Prepared Subsequent to September, 1996, by Infection Control Committee of Sternal Wound Infections (1996) . . . .

"68. Statistics Prepared Subsequent to February 28, 1997, by Infection Control Committee of Sternal Wound Infections (October 1, 1996, through February 28, 1997) . . . .

"69. Statistics Prepared Subsequent to February 28, 1997, by Infection Control Committee of Sternal Wound Infections (October 1, 1996, through February 28, 1997) . . . .

"70. Summary Prepared by Infection Control Committee of Sternal Wound Infections (1996, First Quarter 1997, and January, 1997) . . . .

camera review. One week thereafter, the plaintiffs filed a reply.

On May 28, 1999, the trial court issued a memorandum of decision denying the defendants' motion for protective order and overruling their objections based on the

"71. Statistics Prepared Subsequent to June 30, 1997, by Infection Control Committee of Sternal Wound Infections (October 1, 1996, through June 30, 1997) . . . .

"72. Chart and Summary Prepared by Infection Control Committee of Laboratory Date Re: MRSA Isolates (1995, 1996, 1997 and 1998) . . . .

"73. Chart and Summary Prepared by Infection Control Committee of Laboratory Data Re: VRE Isolates (1996, 1997 and 1998) . . . .

"74. Chart and Summary Prepared by Infection Control Committee of Post-Operative Surgical Wound Infections (1988 through 1998) . . . .

"75. Chart and Summary Prepared by Infection Control Committee Re: Chest and Leg/Groin Infections for Non-CABG Procedures (1997) . . . .

"76. Chart and Summary Prepared by Infection Control Committee (1998) . . . .

"77. Memorandum Prepared by Infection Control Committee Re: Events of March 4, 1997, (Investigation by the State of Connecticut) . . . .

"78. Graph Prepared Subsequent to June 30, 1997, by Infection Control Committee of Infection Rates of Clean Surgical Post-Operative Wound Infections (July 1, 1995, through June 30, 1997) . . . .

"79. Graph Prepared Subsequent to June 30, 1997, by Infection Control Committee of Infection Rates of Clean Surgical Post-Operative Wound Infections (July 1, 1995, through June 30, 1997) . . . .

"80. Summary and Chart of Category I Post-Operative Wound Infections Prepared by Infection Control Committee (April, 1997) . . . .

"81. Letter From Member of Infection Control Committee to Department of Public Health Re: Corrective Action (March 27, 1997) . . . .

"82. Department of Health Investigative Report . . . .

"83. Memorandum Prepared by Infection Control Committee . . . .

"84. Memorandum Prepared by Infection Control Committee to Infection Control Committee . . . .

"85. Memorandum Prepared by Infection Control Committee to Infection Control Committee (October 1, 1996, through January 31, 1997) . . . .

"86. Hand-written Notes of Member of Infection Control Committee . . . .

"87. Statistics Prepared by Infection Control Committee (1996) . . . .

"88. Minutes of Infection Control Committee (1996 through 1998) . . . .

"89. Medical Records of Other Patients . . . .

"90. Memorandum Prepared by Infection Control Committee to Medical Staff (February 12, 1997) . . . .

"91. Summary of Pathology Reports Prepared by and for Infection Control Committee (January 1, 1996, to December 31, 1996) . . . ."

peer review and morbidity and mortality studies privileges. Specifically, as to the defendants' peer review privilege claim under § 19a-17b, the trial court found that the documents listed in the privilege log were statistics, graphs, flow charts, memos and chronologies, and that, although they allegedly had been prepared by the hospital's infection control committee, "the bare titles" of the documents listed did not "suggest that their focus is the performance of any health care professional, nor have the defendants supplied any affidavits to the effect that peer review was the task to which the documents are addressed." The trial court also rejected the defendant's claim that the items listed in the log were protected under the morbidity and mortality studies privilege of § 19a-25. According to the court, even though the descriptions of the ninety-one items indicated that they were procured "in the sense of collection or generation, by the defendants' infection control committee . . . [t]he titles and descriptions of the documents do not, however, indicate that they were collected or generated in connection with studies of morbidity or mortality . . . or that they were procured for the purpose of reducing morbidity or mortality. . . . The defendants have not filed any affidavit in which any competent witness has stated whether any of the ninety-one documents for which an exemption is claimed was procured 'in connection with a study of morbidity or mortality,' nor whether the purpose of the study, if there was one, was the reduction of morbidity or mortality." (Internal quotation marks omitted.) With respect to Baker's affidavit, the trial court noted that although Baker had identified himself as a member of the infection control committee, he listed several reasons for which the committee assembles data, including "establishing and enforcing guidelines designed to keep within reasonable bounds the cost of health care . . . . [Although he] avers broadly that the

documents sought by the plaintiffs are an integral part of the infection control committee and were utilized by the infection control committee during its regularly scheduled meetings . . . [t]his affiant provides no information from which this court can determine whether the information sought was collected for a study concerning reduction of morbidity or mortality, the specific limit of the exemption. . . . Baker's statements are vague and general, and appear to assume that any information that comes before the infection control committee, of any kind, is exempt. Since this affiant states that his committee reviews data for some purposes that have nothing to do with reducing morbidity or mortality, such as controlling health care costs, there is no basis for this court to presume that the information at issue was acquired and reviewed for purposes defined by § 19a-25. . . . Averments which do not address those precise issues do not discharge the defendants' burden of proving the exemption applies to the particular documents sought. Indeed, the inference this court draws from the vagueness of the affidavit is that the selected affiant has purposely offered general statements not addressed to the salient issue because he cannot testify that the documents sought were in fact procured (by his committee) in connection with studies of morbidity and mortality conducted by (his committee) . . . for the purpose of reducing morbidity or mortality from any cause or condition." (Internal quotation marks omitted.) The court concluded that although the defendants knew of their burden to prove the facts relevant to their claim of privilege, early on in the proceedings they opposed the idea of a hearing and "offered only the assumptions and conclusions of their counsel and the vague generalities of . . . Baker's affidavit in lieu of competent evidence on the actual issues concerning the nature of the documents in view of the limits of the statutory privilege."

In connection with the plaintiffs' supplemental interrogatories and requests for production, the trial court, relying on the explicit statutory language that "[t]his section shall not be deemed to affect disclosure of regular hospital and medical records made in the course of the regular notation of the care and treatment of any patient, but only records or notations by such staff committees pursuant to their work"; General Statutes § 19a-25; see footnote 1 of this opinion for the full text of § 19a-25; concluded that the medical records of other patients who contracted MRSA during the relevant time period were not protected.[11] The trial court also overruled the defendants' objection to the supplemental request for production pertaining to bacterial isolates, based upon its determination that the defendants had failed to establish any connection between the isolates and the peer review statutes.[12]

Accordingly, the trial court ordered the defendants to disclose the items in the log to the plaintiffs. Pursuant to General Statutes § 52-265a,[13] the defendants appealed

[11] In recognition of the privacy rights of the patients whose records were the subject of the request, the plaintiffs proposed redaction of the patients' names and other identifying information. The trial court imposed certain redaction requirements that are not the subject of this appeal.

[12] Once again, the trial court recognized other issues, such as the privacy interests of those patients from whom samples had been taken and the defendants' duty to retain the samples. The trial court's provisions addressed to these considerations are not the subject of any issue in this appeal.

[13] General Statutes § 52-265a provides: "Direct appeal on questions involving the public interest. (a) Notwithstanding the provisions of sections 52-264 and 52-265, any party to an action who is aggrieved by an order or decision of the Superior Court in an action which involves a matter of substantial public interest and in which delay may work a substantial injustice, may appeal under this section from the order or decision to the Supreme Court within two weeks from the date of the issuance of the order or decision. The appeal shall state the question of law on which it is based.

"(b) The Chief Justice shall, within one week of receipt of the appeal, rule whether the issue involves a substantial public interest and whether delay may work a substantial injustice.

"(c) Upon certification by the Chief Justice that a substantial public interest is involved and that delay may work a substantial injustice, the trial

from the trial court's ruling denying their motion for a protective order and overruling their objections to the plaintiffs' discovery requests. We now address this interlocutory ruling and conclude that the trial court's decision was proper.[14]

I

On appeal, the defendants contend that the trial court improperly denied their motion for a protective order and overruled their objections to discovery based on their claim of privilege under §§ 19a-17b and 19a-25. They argue that the scope of the plaintiffs' discovery requests, in conjunction with Baker's affidavit, demonstrate conclusively that the documents in question were created by a medical review committee charged with evaluating the performance of health care professionals so as to reduce the incidence of morbidity and mortality. Taking as true the averments in Baker's affidavit that the documents in question were procured by a medical review committee that is charged with conducting peer review and reducing the incidence of morbidity and mortality; *Barrett* v. *Danbury Hospital*, 232 Conn. 242, 262, 654 A.2d 748 (1995); we nonetheless conclude that

judge shall immediately transmit a certificate of his decision, together with a proper finding of fact, to the Chief Justice, who shall thereupon call a special session of the Supreme Court for the purpose of an immediate hearing upon the appeal.

"(d) The Chief Justice may make orders to expedite such appeals, including orders specifying the manner in which the record on appeal may be prepared."

[14] Following the granting of the defendants' application for certification, Ronald Cone and Robert Korchman, who have separate actions pending against the defendants for alleged damages incurred as a result of having contracted MRSA while patients at the hospital, were granted permission to be added as appellees in this appeal. Additionally, James P. Clarke and Margaret Clarke were also granted permission to be added as appellees in this appeal in light of their pending action against the defendants for alleged damages sustained as a result of James Clarke's having contracted MRSA while a patient at the hospital.

the defendants have failed to establish that the documents are immune from discovery under either § 19a-17b or § 19a-25.

Our analysis of this issue is guided by well established legal principles. "Statutory construction is a question of law and therefore our review is plenary." *Davis* v. *Norwich*, 232 Conn. 311, 317, 654 A.2d 1221 (1995). "[O]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . . *State* v. *Burns*, 236 Conn. 18, 22–23, 670 A.2d 851 (1996); *State* v. *Spears*, 234 Conn. 78, 86–87, 662 A.2d 80 (1995)." (Internal quotation marks omitted.) *Connecticut National Bank* v. *Giacomi*, 242 Conn. 17, 32, 699 A.2d 101 (1997). In undertaking this analysis, we are mindful that, as with any claim of privilege, a statutory privilege "has the effect of withholding relevant information from the factfinder . . . ." *Shew* v. *Freedom of Information Commission*, 245 Conn. 149, 157, 714 A.2d 664 (1998); *Ullmann* v. *State*, 230 Conn. 698, 713, 647 A.2d 324 (1994). Accordingly, although a statutory privilege must be applied so as to effectuate its purpose, it is to be applied cautiously and with circumspection because it impedes the truth-seeking function of the adjudicative process.

With respect to the appropriate standard of review, Practice Book § 13-14 (a) provides in relevant part that a trial court "may, on motion [to compel production], make such order as the ends of justice require." Consequently, although we review the trial court's factual findings to determine whether they are clearly errone-

ous, "[t]he granting or denial of a discovery request rests in the sound discretion of the court." *Standard Tallow Corp.* v. *Jowdy*, 190 Conn. 48, 57, 459 A.2d 503 (1983). Provided the trial court properly interpreted the pertinent statutes, a question over which this court has plenary review; *Davis* v. *Norwich*, supra, 232 Conn. 317; that decision will be reversed only if such an order constitutes an abuse of that discretion. *Metropolitan Life Ins. Co.* v. *Aetna Casualty & Surety Co.*, 249 Conn. 36, 51, 730 A.2d 51 (1999). We conclude that the trial court properly interpreted the statutes in question and did not abuse its discretion in applying them to the facts of the case.

A

We begin with § 19a-17b. "As with any issue of statutory interpretation, our initial guide is the language of the statute itself." (Internal quotation marks omitted.) *Federal Deposit Ins. Corp.* v. *Peabody, N.E., Inc.*, 239 Conn. 93, 102, 680 A.2d 1321 (1996). Section 19a-17b (d) provides: "The proceedings of a medical review committee conducting a peer review shall not be subject to discovery or introduction into evidence in any civil action for or against a health care provider arising out of the matters which are subject to evaluation and review by such committee, and no person who was in attendance at a meeting of such committee shall be permitted or required to testify in any such civil action as to the content of such proceedings; provided the provisions of this subsection shall not preclude (1) in any civil action, the use of any writing which was recorded independently of such proceedings; (2) in any civil action, the testimony of any person concerning the facts which formed the basis for the institution of such proceedings of which he had personal knowledge acquired independently of such proceedings; (3) in any health care provider proceedings concerning the termination or restriction of staff privileges, other than peer

review, the use of data discussed or developed during peer review proceedings; or (4) in any civil action, disclosure of the fact that staff privileges were terminated or restricted, including the specific restriction imposed, if any."

Section 19a-17b (a) defines "peer review" and "medical review committee" as follows: "(2) 'Peer review' means the procedure for evaluation by health care professionals of the quality and efficiency of services ordered or performed by other health care professionals, including practice analysis, inpatient hospital and extended care facility utilization review, medical audit, ambulatory care review and claims review. . . . (4) 'Medical review committee' shall include any committee of a state or local professional society or a committee of any health care institution established pursuant to written bylaws, and any utilization review committee established pursuant to Public Law 89-97, and a professional standards review organization or a state-wide professional standards review council, established pursuant to Public Law 92-603, engaging in peer review, to gather and review information relating to the care and treatment of patients for the purposes of (A) evaluating and improving the quality of health care rendered; (B) reducing morbidity or mortality; or (C) establishing and enforcing guidelines designed to keep within reasonable bounds the cost of health care. It shall also mean any hospital board or committee reviewing the professional qualifications or activities of its medical staff or applicants for admission thereto."

The plaintiffs contend that the statute, by its language, limits the privilege to the "proceedings of a medical review committee conducting a peer review"; General Statutes § 19a-17b (d); which is a specifically defined activity. They further argue that although the statute protects the content of peer review proceedings, it does not necessarily shield all documents used in such

proceedings, nor does it shield all documents utilized by a committee charged, in part, with conducting peer review. We agree.

Simply because a hospital committee is a medical review committee does not suggest that all of its activities are considered peer review proceedings. The scope of § 19a-17b is specifically defined, not by the nature of the committee, but by whether the committee was engaged in "peer review." See General Statutes § 19a-17b (d). That qualifier has been defined separately and, we presume, intentionally. See *Hall* v. *Gilbert & Bennett Mfg. Co.*, 241 Conn. 282, 303, 695 A.2d 1051 (1997). Furthermore, the privilege applies only to those documents that reflect the "proceedings" of a peer review, or that were created primarily for the purpose of being utilized during the course of peer review. In addition, the privilege does not apply to those documents that were independently "recorded" or "acquired." See General Statutes § 19a-17b (d) (1) and (2).

We conclude that by using the word "proceedings," the legislature intended to restrict the privilege to the substantive discourse that takes place at the actual meetings during which "matters which are subject to evaluation and review by such committee," are discussed and deliberated. General Statutes § 19a-17b (d); see Conn. Joint Standing Committee Hearings, Public Health and Safety, Pt. 1, 1976 Sess., pp. 284–85; 23 H.R. Proc., Pt. 24, 1980 Sess., p. 7098 (1980 amendment). Although the statute does not define "proceedings," that term, as construed in accordance with its common usage; see *State Board of Labor Relations* v. *Freedom of Information Commission*, 244 Conn. 487, 497, 709 A.2d 1129 (1998); refers to "an official record of things said or done." Merriam-Webster's Collegiate Dictionary (10th Ed. 1995). In the context of § 19a-17b, therefore, we read proceedings as encompassing the sequence of

events or the course of action undertaken by a committee engaged in peer review, such as the dialogues, debates and discussions that transpire at a peer review meeting, as well as opinions and conclusions reached by committee members.

The legislative history surrounding the statute further indicates that the privilege applies to the peer review committee's self-generated analysis, but not to the underlying facts that provide the basis for that analysis when such facts have been collected by an independent source. In 1976, the first proposed version of the peer review statute, House Bill No. 5826, § 4, provided that "[t]he proceedings and records of a medical review committee shall not be subject to discovery or introduction into evidence in any civil action against a health care provider . . . ." Thereafter, the conference committee eliminated the phrase "proceedings and records" and substituted instead the word "opinions," explaining: "The difference between [House Amendment Schedule 'B'] and file No. 399 has to do with section 4. Section 4 gave many of us, particularly in the House, a great deal of technical problems because it would appear . . . to create a method *whereby certain evidence could be washed through a Peer Review group and thereby be immunized from utilization in any other proceedings.* What House 'B' does is insert a new section 4 which restricts this [privilege] to the *opinions* of the medical review committee . . . . *It makes it crystal clear that evidence itself has not been surrounded with the immunity.*" (Emphasis added.) 19 H.R. Proc., Pt. 9, 1976 Sess., pp. 4093–94, remarks of Representative James T. Healey; see R. Brunnell, "Connecticut's Peer Review Immunity Statute: A Legislative History of P.S. 76-413," 43 Conn. Med. 571 (September 1979). The bill, which ultimately was codified as General Statutes § 38-19a (d), now § 19a-17b (d), provided in

pertinent part: "The opinions of a medical review committee shall not be subject to discovery or introduction into evidence in any civil action for or against a health care provider . . . ."

Thereafter, in 1980, the legislature amended the statute to provide protection for "proceedings of a medical review committee conducting a peer review," simultaneously adding language permitting discovery of "independently recorded writings" and testimony of those individuals having "independently acquired" personal knowledge. Public Acts 1980, No. 80-446; see Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 1980 Sess., pp. 553–54, remarks of Robert J. Brunnell. This language was intended to "allow for some confidentiality in peer review proceedings with regard to any hospitals and medical facilities, but, at the same time, it does allow that should there be a civil action with regard to any possible malpractice, that while protecting that peer review confidentiality . . . any knowledge gained really independent of that peer review proceeding would be allowable in a civil action." 23 H.R. Proc., Pt. 24, 1980 Sess., pp. 7096–97, remarks of Representative Richard Lawlor. Returning briefly to the language of the statute itself, we note in the exemptions to the protection, the legislature's use of "any writing . . . recorded independently of such proceedings [and] . . . the testimony of any person concerning the facts which formed the basis for the institution of such proceedings . . . ." General Statutes § 19a-17b (d) (1) and (2).

In light of the statute's language and legislative history, we conclude that the privilege afforded by § 19a-17b applies to the substantive exchanges that transpire during the course of a peer review meeting, and that confidentiality is provided for such exchanges, but not for any knowledge gained by a committee member independent of that meeting. Thus, for example, the minutes

of a meeting reflecting such exchanges would be privileged under the statute. We note that often such exchanges may be based upon documents that were submitted to the members of the committee engaging in peer review, but which were generated for more than one purpose. We conclude that the peer review privilege applies to those documents provided they were created principally for the purpose of peer review.

This interpretation is consistent with the aim of the peer review privilege, which is to encourage committee members to "take positions that they might not otherwise take if they thought they were going to be subpoenaed in the middle of a malpractice case." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 1980 Sess., p. 561; see also *Mahmoodian* v. *United Hospital Center, Inc.*, 185 W. Va. 59, 65, 404 S.E.2d 750, cert. denied, 502 U.S. 863, 112 S. Ct. 185, 116 L. Ed. 2d 146 (1991) (peer review privilege "evinces public policy encouraging health care professionals to monitor the competency and professional conduct of their peers in order to safeguard and improve the quality of patient care"). "[O]nly where . . . peer review committees . . . are assured of confidentiality [will they] feel free to enter into uninhibited discussions of their peers." *Claypool* v. *Mladineo*, 724 So. 2d 373, 388 (Miss. 1998); see also *Cruger* v. *Love*, 599 So. 2d 111, 114–15 (Fla. 1992) (peer review privilege is "intended to prohibit the chilling effect of the potential public disclosure of statements made to or information prepared for and used by the committee in carrying out its peer-review function"); *Trinity Medical Center, Inc.* v. *Holum*, 544 N.W.2d 148, 155 (N.D. 1996) ("physicians . . . would not feel free to openly discuss the performance of other doctors practicing in the hospital, without assurance that their discussions in committee would be confidential and privileged"); *Moretti* v. *Lowe*, 592 A.2d 855, 857 (R.I. 1991) ("[i]n enacting [Rhode Island's] peer-review

statute, the Legislature recognized the need for open discussions and candid self-analysis in peer-review meetings to ensure that medical care of high quality will be available to the public").

Moreover, this interpretation of § 19a-17b does not interfere substantially with a medical malpractice plaintiff's access to information, given that evidence of a practitioner's negligence is immune from discovery only to the extent that it is disclosed solely during the course of peer review. Should a conflict between access to such evidence and peer review confidentiality arise, it was the legislature's judgment in enacting the peer review privilege that the strong public policy favoring open peer review would outweigh any incidental burden on discovery. See *Santa Rosa Memorial Hospital* v. *Superior Court*, 174 Cal. App. 3d 711, 720, 220 Cal. Rptr. 236 (1985) (peer review statute " 'embraces the goal of medical staff candor at the cost of impairing plaintiffs' access to evidence' "); *State ex rel. Shroades* v. *Henry*, 187 W. Va. 723, 727, 421 S.E.2d 264 (1992) ("[t]he peer review privilege represents a legislative choice between medical staff candor and the plaintiff's access to evidence").

B

Having established the contours of the privilege under § 19a-17b, we now determine whether the trial court properly interpreted the statute in applying it to the facts of this case. In the proceedings below, the trial court made no express finding as to whether the hospital's infection control committee met the statutory definition of a "medical review committee," nor whether the documents in question constituted part of the "proceedings" of such a committee. The court did recognize, however, that "[t]he scope of the peer review exemption is defined not by the nature of the committee but by whether it is engaged in 'peer review,' since the

exemption from discovery quoted [in the statute] on its face relates only to 'the proceedings of a medical review committee conducting a peer review' not to all activities conducted by a medical review committee." In light of this requirement, the court denied the defendants' motion for a protective order on the ground that "[t]he titles of the documents listed [in the privilege log] do not suggest that their focus is the performance of any health care professional, nor have the defendants supplied any affidavits to the effect that peer review was the task to which the documents are addressed."

We find, based on the trial court's focus on the nature of the documents in question, that it undertook to evaluate all requisite statutory factors. See *Bornemann* v. *Bornemann*, 245 Conn. 508, 539, 752 A.2d 978 (1999) (trial court's opinion demonstrates proper interpretation of statute despite lack of express reference to statutory factors). The defendants had supported their assertion that the documents in question constituted part of the "proceedings" of a "medical review committee" under § 19a-17b (d) with the uncontradicted affidavit of Baker that attested to the peer review function of the infection control committee, and to the fact that the documents in question were in some manner produced, generated or utilized by that committee. We assume that the trial court accepted the truth of those assertions. See *Barrett* v. *Danbury Hospital*, supra, 232 Conn. 262 (trial court permitted to accept truth of defendant hospital's uncontroverted evidence). That the trial court nevertheless denied the defendants' motion reflects its proper understanding that even if the documents did constitute part of the "proceedings" of a "medical review committee," the privilege would apply only if the documents related to "peer review."[15]

---

[15] In light of the trial court's determination that the documents in question did not reflect the activity of the committee engaged in "peer review," the court did not reach the question of whether the documents constituted a "writing which was recorded independently" of a peer review, or reflected

## C

Having concluded that the trial court adopted a proper interpretation of § 19a-17b, the ultimate issue in our review is whether, in applying the statute, the trial court reasonably could have concluded as it did. *Simmons* v. *Simmons*, 244 Conn. 158, 175, 708 A.2d 949 (1998). "Our review is guided by the well established principle that [t]he resolution of conflicting factual claims falls within the province of the trial court . . . [and] [t]he trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . *Herbert S. Newman & Partners, P.C.* v. *CFC Construction Ltd. Partnership*, 236 Conn. 750, 762, 674 A.2d 1313 (1996)." (Internal quotation marks omitted.) *Bornemann* v. *Bornemann*, supra, 245 Conn. 527.

We review the trial court's discovery ruling mindful that testimony adequate to establish an exemption from disclosure "must not be couched in conclusory language or generalized allegations, however, but should be sufficiently detailed, without compromising the asserted right to confidentiality . . . ." *Wilson* v. *Freedom of Information Commission*, 181 Conn. 324, 341, 435 A.2d 353 (1980); see also *State ex rel. Shroades* v. *Henry*, supra, 187 W. Va. 727 (protective order issued upon "the assertion of a blanket privilege against discovery . . . constitutes abuse of discretion"); *State ex rel. Friedman* v. *Provaznik*, 668 S.W.2d 76, 80 (Mo. 1984). Confidentiality properly attaches to peer review documents only when the moving party has provided "sufficient information to enable the court to determine that each element of the privilege is satisfied. . . . A

---

facts of which a witness had "personal knowledge acquired independently" of a peer review proceeding such that even if reflective of "peer review," the documents would not be immune from discovery pursuant to § 19a-17b (1) and (2).

failure of proof as to any element of the privilege causes the claim of privilege to fail." (Citations omitted.) *State ex rel. Dixon* v. *Darnold*, 939 S.W.2d 66, 70 (Mo. App. 1997).

In the trial court proceedings, the defendants argued, in effect, that § 19a-17b bars discovery of all records, proceedings and documents utilized by a medical review committee having the responsibility of conducting peer review as one of their functions. The defendants argued further that the hospital's infection control committee is a "medical review committee" as defined under the statute, and that the plaintiffs' interrogatories and production requests seek documents generated by that committee. As we have stated, however, § 19a-17b applies only to the proceedings of a medical review committee that is actually "engaged in peer review." Therefore, the defendants' assertion that the documents are privileged by virtue of having been created by the hospital's infection control committee implies that the sole function of that committee is to conduct peer review.

The infection control committee, however, performs other functions as well. For example, it discharges the hospital's institutional obligations pursuant to § 19-13-D3 of the Regulations of Connecticut State Agencies and the Hospital Accreditation Standards of the Joint Commission on Accreditation of Healthcare Organizations (Accreditation Standards).[16] In that capacity, the infection control committee undertakes a number of tasks, some of which are unrelated to peer review. The defendants themselves contend that the committee is created pursuant to hospital bylaws to carry out the

---

[16] The hospital is accredited under, and thereby certified as in compliance with the requirements of, the hospital program of the Joint Commission on Accreditation of Healthcare Organizations. See American Hospital Association Guide to the Health Care Field (1999–2000 Ed.) p. A74.

mandates of § 19-13-D3. That regulation requires that all short term hospitals in the state of Connecticut assemble an "infection control committee" for the purpose of administering an "infection prevention, surveillance and control program." See Regs., Conn. State Agencies § 19-13-D3 (*l*) (1). In discharging this function, the committee must: (1) adopt working definitions of hospital associated infections; (2) develop standards for surveillance of infections and conditions predisposed to infection; and (3) develop a mechanism for monitoring, evaluating, reporting and controlling infections and environmental conditions with infection potential. See Regs., Conn. State Agencies § 19-13-D3 (*l*) (4). With respect to review and reporting, the committee shall, at a minimum: (1) review information obtained from the program's day-to-day surveillance activities; (2) review and revise existing standards; and (3) report to the medical executive committee. See Regs., Conn. State Agencies § 19-13-D3 (*l*) (7).

Similarly, the Accreditation Standards require hospitals to establish a program for "surveillance, prevention, and control of infection," through the implementation of a "coordinated process" that reduces the risk of infections in patients and health care workers. See Joint Commission on Accreditation of Healthcare Organizations, Hospital Accreditation Standards (1998) § IC, pp. 211, 212. That process is "comprehensive, encompassing both patient care and employee health services." Id., p. 214. Although the focus on patient care is likely to include peer review, "infection control . . . is integrated with the hospital's overall process for assessing and improving organization performance." Id. Significantly, infection control "covers a broad range of processes and activities . . . that are coordinated and carried out by the hospital. This function also links with external organization support systems to reduce the risk of infection from the environment, including

food and water sources." Id., p. 211. In this regard, the Accreditation Standards require that hospital management systems provide "support activities such as data analysis, interpretation, and presentation of findings"; id., p. 214; and that an infection control committee report "information about infections both internally and to public health agencies." Id., p. 213.

Both § 19-13-D3 of the regulations and the Accreditation Standards establish the hospital's obligation, as an institution, to assess, prevent and control infection within its premises through a system of integrated resource management. That institutional responsibility is independent of the hospital's duty to monitor the quality of services performed by its medical staff through an effective program of peer review. See *Santa Rosa Memorial Hospital* v. *Superior Court*, supra, 174 Cal. App. 3d 725–26. Where a single committee is charged with carrying out both responsibilities, the proceedings of that committee are immune from disclosure under § 19a-17b only to the extent that its members are engaged in "peer review." See id., 726 (no privilege under California statute for proceedings "independent of the investigative and evaluative activities" of the infection control committee when it is engaged in peer review); *Fulton-DeKalb Hospital Authority* v. *Dawson*, 270 Ga. 376, 509 S.E.2d 28, 31 (1998) (committee qualifying as review organization under Georgia's peer review statute not protected when performing function other than peer review); *Claypool* v. *Mladineo*, supra, 724 So. 2d 387 (privilege pertains to proceedings of committee formed with "sole" purpose of conducting peer review, but not to committee peripherally engaged in peer review). To hold otherwise would contravene the express language of the statute, and allow hospital administrators to insulate from discovery information relating to the adequacy of medical care provided at their facility simply by delegating their institutional

responsibilities in that regard to a committee that is simultaneously charged with conducting peer review.

Therefore, although the hospital's infection control committee, in assessing the quality of medical staff performance, engages in peer review, it also discharges the hospital's institutional responsibility regarding infection prevention, tracking, surveillance and control. In light of these multiple tasks, application of the privilege to the proceedings of the infection control committee depends on the nature of the documents in question and whether they relate to peer review. In turn, the nature of a particular document can be discerned only pursuant to an evaluation of the purpose for which the document was created and the use to which it was put. See *Carr* v. *Howard*, 426 Mass. 514, 529, 689 N.E.2d 1304 (1998) (privilege requires testimony of "way in which given record was produced or how it was used"); *Shelton* v. *Morehead Memorial Hospital*, 318 N.C. 76, 86, 347 S.E.2d 824 (1986) (denying privilege where defendant failed to provide information regarding the "reason for [document's] creation"); *State ex rel. Shroades* v. *Henry*, supra, 187 W. Va. 729 (party asserting privilege should identify source and reason for document's creation). In the absence of evidence to that effect, the trial court reasonably could not have concluded that the defendants had established that the documents in question relate to peer review.

We note that throughout the lower court proceedings, the trial court afforded the defendants numerous opportunities and ample means by which to establish the privilege, including the submission of documents for in camera review. At the case management conference of February 24, 1999, and then again on March 19, 1999, the parties were ordered to take all steps necessary for resolution of then pending discovery disputes. The order of March 19, 1999, specifically advised the defendants to submit a privilege log "listing any document

claimed to be privileged," and "list[ing] what the claimed source of the privilege or exemption [is]." Thereafter, in response to the defendants' protests, the trial court extended the time for making submissions an additional thirty days. The court reiterated that the defendants were to comply with its previous order to file a privilege log, and specifically advised the defendants that where the nature of a document was not apparent by its title, "that document shall be supplied to the court but not to the plaintiff(s) at this stage."

The defendants made no assertion that the scope of the trial court's inquiry was inadequate or prejudicial, nor did they accept the trial court's invitation to submit the allegedly privileged documents for inspection. The defendants relied instead on the following evidence in support of their motion for a protective order and their objection to discovery requests: (1) their submissions filed previously in response to the plaintiffs' discovery requests; (2) Baker's affidavit; and (3) the privilege log.

The defendants filed three memoranda pertinent to the trial court's discovery ruling, namely, the September 4, 1998 memorandum in support of their motion for a protective order, the March 12, 1999 memorandum in reply to the plaintiffs' opposition to that motion, and the April 15, 1999 memorandum in support of their objections to the plaintiffs' interrogatories and document requests.[17] Neither of the first two memoranda identified any specific documents as to which the defendants asserted a privilege, nor did either indicate that the plaintiffs' discovery request sought material related to peer review. As to the defendants' final memorandum, none of the assertions therein established that

---

[17] The defendants' memorandum in support of their objections to the plaintiffs' interrogatories and document requests incorporated by reference their prior memorandum in support of their motion for a protective order and their memorandum in reply to the plaintiffs' opposition to that motion.

the nature of the documents in question indicated their relation to peer review.

Turning to these memoranda in specific, in the September 4, 1998 memorandum in support of their motion for protective order, the defendants asserted conclusorily that the requested documents "originated from the [i]nfection [c]ontrol [c]ommittee at [the hospital] and were composed for the purpose of infection control and quality control. The document requests are objected to insofar that they seek . . . privileged material protected by [§§] 19a-17b and 19a-25." Similarly, the defendants' March 12, 1999 memorandum replying to the plaintiffs' opposition to their motion for protective order established only that the plaintiffs sought documents that "pertain to policies and procedures enacted by the infection control committee and documents specifically created to research and investigate any rise in the level of MRSA."

The defendants' April 15, 1999 memorandum in support of their objections to the plaintiffs' interrogatories and request for identified items; see footnote 5 of this opinion; were more pointed. For example, in addition to asserting broadly that the documents in question were protected "because they emanate from the [i]nfection [c]ontrol [c]ommittee," the defendants specifically objected to the plaintiffs' sixth request for production which sought any documents that "reflect, pertain to or relate to the manner in which decisions were made at [the hospital] regarding any MRSA infection which developed at the hospital in 1996–1997." According to the defendants' memorandum, such documents were protected by the peer review privilege because they reflected the infection control committee's decision-making process, which included "the preparation of charts, graphs and summaries by the [i]nfection [c]ontrol [c]ommittee and for the [committee] in order to aid in decision making and any corrective measures."

The memorandum also raised the defendants' objection to the plaintiffs' ninth request for production, which sought "documents prepared by the [i]nfection [c]ontrol [o]fficer at [the hospital]." According to the defendants, such documents "may not be disclosed . . . without a violation of the statute."

The defendants' memoranda, although establishing that the documents in question emanated, in some manner, from the hospital's infection control committee, do not establish that the documents in question were generated principally for the purpose of "peer review." Specifically, the defendants made no claim that the documents reflect the infection control committee's deliberations with respect to an analysis of medical staff practices, a facility utilization review, a medical audit, a review of ambulatory care or a claims review. Nor did the defendants claim that the infection control committee engaged in such deliberations for the purpose of evaluating the performance of a health care professional. Absent a detailed assertion to that effect, the defendants' memoranda could not supply the trial court with a sufficient factual predicate from which it could discern the nature of the allegedly privileged items.

Turning to Baker's affidavit, the assertions therein, if taken as true, establish three relevant points: (1) that the infection control committee is a "medical review committee" as that term is defined in the statute; (2) that one of the functions of the infection control committee is "peer review"; and (3) that the documents at issue were in some manner procured by the infection control committee during a regularly scheduled meeting. Baker's affidavit does not attest to the nature of the information contained in the documents, nor to the fact that, as the trial court stated, "peer review was the task to which the documents are addressed."

Further, no entry contained in the defendants' privilege log reflects the documents' relation to "peer review." See footnote 10 of this opinion. The privilege log lists ninety-one documents for which the defendant sought a protective order § 19a-17b. In its entirety, each entry identifies a particular document by title and date of creation, and references the statutory privilege being claimed. Although the title of each document indicates that it was in some manner prepared, created, requested or received by the infection control committee, "the log provides no information to indicate for what purpose each document was prepared or how it was used." More specifically, as the trial court noted, the titles of the documents "do not suggest that their focus is the performance of any health care professional . . . ."

On the basis of the evidence before it, the trial court properly denied the defendants' motion for a protective order. As explained previously, a document is not immune from discovery simply by virtue of having been generated by a medical review committee charged, in part, with conducting peer review. The defendants produced no evidence to demonstrate that the documents were produced primarily for the purpose of peer review, and therefore warranted protection under § 19a-17b.

## II

We next review the defendants' claim that the documents are privileged under § 19a-25. That section provides in pertinent part: "All information, records of interviews, written reports, statements, notes, memoranda or other data . . . procured by . . . staff committees of facilities accredited by the Department of Public Health in connection with studies of morbidity and mortality conducted by . . . such staff committees, or carried on by . . . such staff committees jointly with other persons, agencies or organizations

. . . for the purpose of reducing the morbidity or mortality from any cause or condition, shall be confidential and shall be used solely for the purposes of medical or scientific research . . . . Such information, records, reports, statements, notes, memoranda or other data shall not be admissible as evidence in any action of any kind in any court . . . ." General Statutes § 19a-25. The scope of confidentiality and inadmissibility mandated by this statute does not extend to all records, as the concluding sentence makes clear: "This section shall not be deemed to affect disclosure of regular hospital and medical records made in the course of the regular notation of the care and treatment of any patient, but only records or notations by such staff committees pursuant to their work." General Statutes § 19a-25.

The defendants argue, in effect, that the statute protects from discovery information collected or generated by a medical review committee that procures information related to patient morbidity or mortality. They argue further that taken together, Baker's affidavit and the privilege log sufficed to establish that the documents sought were protected by § 19a-25, and that if more detailed information were required with respect to the activities of the infection control committee or the creation of the documents themselves, the court should have afforded the defendants an opportunity to present additional evidence to that effect. We disagree with both of the defendants' contentions. Based on our review of the record, we hold that the trial court properly determined that the evidence presented by the defendants did not establish that the statutory privilege applied to the documents in question, and further, that the trial court had afforded the defendants adequate opportunity to establish the privilege.

A

We again use the principles of statutory construction in resolving this claim. As stated previously, we first

review the language of the statute itself. See *Federal Deposit Ins. Corp.* v. *Peabody, N.E., Inc.*, supra, 239 Conn. 102. By its terms, § 19a-25 does not address all documents procured by a hospital "staff committee," but only such documents procured "in connection with studies of morbidity and mortality . . . ." Moreover, confidentiality attaches to these documents only when the study itself is undertaken for the distinct "purpose of reducing morbidity or mortality . . . ." General Statutes § 19a-25. Thus, the language of the statute contemplates the protection of material related to a specific topic when it is collected for a distinct purpose.

Moreover, even among the narrow class of otherwise privileged documents, the language of the statute provides that confidentiality does not attach to "hospital and medical records" made in the course of patient "care and treatment . . . ." Thus, the notations of a treating physician or nurse are not protected, even if those notations are utilized in a study of morbidity or mortality undertaken for the purpose of improving the quality of care. See *Buss* v. *Edwards*, 203 Ill. App. 3d 992, 996–97, 561 N.E.2d 356 (1990) (holding that patient's medical records fall into statutory exception for privileged documents despite that records may be used for research and studies).

The legislative history of § 19a-25 underscores that the medical studies privilege protects research conducted for the purpose of reducing instances of morbidity and mortality, but not information collected in the course of routine patient care or for other purposes unrelated to reductions in morbidity and mortality. As first enacted in 1961, the medical studies privilege applied solely to the work of perinatal and maternal mortality study committees. See Conn. Joint Standing Committee Hearings, General Law, Pt. 1, 1961 Sess., p. 271. During the legislative committee hearings on the

original bill, one proponent reassured committee members that confidentiality would attach to "only a scientific research study, and the cause of death of an unidentified patient treated by an unidentified doctor in an unidentified hospital." Id., p. 273, remarks of Roswell E. Johnson, chairman of the state medical society's committee on perinatal morbidity and mortality. Other commentators characterized the proposed immunity in terms of the committee's "investigations" into instances of mortality; id., p. 270, remarks of Joseph P. Cooney; as well as "studies" and "research" into the causes of death of mothers and infants undertaken for the distinct purpose of "pointing out from past experiences ways to improve medical care." Id., pp. 272–73, remarks of Roswell Johnson. Moreover, Johnson emphasized the relatively narrow focus of the pending legislation by remarking that "[other] states . . . have adopted laws specifically for the purpose of protecting not only studies such as we're considering but also the participants in these studies both physicians and patients." Id., p. 274. By way of comparison, he stated that the bill under consideration would not protect "the records of the case, as they are in the hospital." Id., p. 273.

Thereafter, in 1971, the legislature amended § 19a-25; see Public Acts 1971, No. 811; to make its provisions applicable to data procured by all "staff committees" engaged in studies of morbidity and mortality. Conn. Joint Standing Committee Hearings, General Law, Pt. 2, 1971 Sess., p. 535. At the same time, the legislature nevertheless declined to extend the privilege beyond those committees "set up to carry on review and study of cases [of morbidity and mortality] in [medical facilities]." Id., remarks of Isadore Friedberg. In this respect, the privilege was designed "to protect certain kinds of records, and yet to make available what always has traditionally been available to subpoena or other proper authority." 14 H.R. Proc., Pt. 9, 1971 Sess., p. 4112,

remarks of Representative Carl R. Ajello, Jr. Ajello continued, stating that "it is our legislative intent to specifically continue to maintain the availability of proper records to subpoenas, in the case of court proceedings . . . . The notes of surgical performances and the operating room procedures . . . all of which has formerly been available . . . will continue to be available, but there will be records done in the course of auditing these performances, and they may now be kept with some degree of safety." Id., p. 4113.

Section 19a-25 is premised on the belief that, without the statutory privilege, physicians would be reluctant to engage in "a full and frank discussion" of their colleagues that is integral to "the administration of good medical care." Conn. Joint Standing Committee Hearings, General Law, Pt. 2, 1971 Sess., p. 536, remarks of John Q. Tilson; see also Conn. Joint Standing Committee Hearings, Public Health and Safety, Pt. 1, 1971 Sess., p. 103, remarks of Tilson ("the records of [research] committees should be kept confidential . . . [so as not] to make doctors more reluctant than they are to discuss frankly these problems that arise in the treatment of hospital cases"). As the Supreme Court of Illinois stated in addressing similar language from the Illinois Medical Studies Act:[18] "The purpose of the [Medical Studies] Act is to encourage candid and voluntary studies and programs used to improve hospital conditions and patient care or to reduce the rates of death and disease." Niven v. Siqueira, 109 Ill. 2d 357, 366, 487 N.E.2d 937 (1995); see Jenkins v. Wu, 102 Ill. 2d 468, 480, 468 N.E.2d 1162 (1984) (purpose of legislation "is to ensure the effectiveness of professional self-evaluation, by members of the medical profession, in the interest of improving the quality of health care"). Section 19a-25 is, however, in no way intended to provide immunity for all material, without regard to its purpose

---

[18] See 735 Ill. Comp. Stat. 5/8-2101 (West 1996).

or effect, produced or utilized by a hospital staff committee. See *Doe* v. *Illinois Masonic Medical Center*, 297 Ill. App. 3d 240, 696 N.E.2d 707, 711 (application of medical studies privilege does not preclude "full and complete access to [patient's] own records," nor entitle plaintiffs' to "depose all persons involved in their treatment and engage experts to give opinions as to the quality of care received"), appeal denied, 179 Ill. 2d 580, 705 N.E.2d. 436 (1998). In light of the statute's language and legislative history, we conclude that the privilege afforded by § 19a-25 is limited to the designated materials of a hospital staff committee that are generated primarily for the purpose of the study of morbidity and mortality, undertaken specifically for the purpose of reducing the incidence of patient deaths.

B

Having delineated the scope of § 19a-25, we now determine whether the trial court properly applied the statute to the defendants' claim. In its memorandum of decision, the trial court interpreted the language of the statute as requiring a three part showing to invoke the privilege. Pursuant to that understanding, the trial court evaluated the defendants' evidence to determine whether, in accordance with the statute, the documents were "procured by a staff committee . . . in connection with studies of morbidity and mortality . . . for the purpose of reducing morbidity and mortality." (Internal quotation marks omitted.) In this regard, the trial court was satisfied that the description of the items "indicate that they were procured, either in the sense of collection or generation, by the defendants' infection control committee." The trial court nevertheless denied the defendants' motion on the ground that the description did not "indicate that [the documents] were collected or generated in connection with studies of morbidity or mortality . . . or that they were procured

for the purpose of reducing morbidity or mortality." (Internal quotation marks omitted.)

The trial court's analysis demonstrates its proper understanding that the privilege afforded by § 19a-25 is not unlimited in scope, but, rather, applies only to documents of a particular nature procured for a specified purpose. We must determine, therefore, whether the trial court reasonably concluded that the defendants had not satisfactorily established that the documents at issue were generated principally for a morbidity or mortality study undertaken for the purpose of reducing incidents of patient death. The trial court's conclusions in this regard are factual findings that will not be upset unless they are "clearly erroneous in light of the evidence and the pleadings in the record as a whole." (Internal quotation marks omitted.) *Bornemann* v. *Bornemann*, supra, 245 Conn. 527.

In asserting an immunity from discovery under § 19a-25, the defendants relied on the same memoranda, privilege log and affidavit discussed in section II C of this opinion. We evaluate this evidence, mindful that, like the peer review privilege, the medical studies privilege cannot be invoked without competent testimony to establish the requisite nature of the documents sought to be withheld. See, e.g., *Ekstrom* v. *Temple*, 197 Ill. App. 3d 120, 126–27, 553 N.E.2d 424 (1990) (trial court properly ordered disclosure where hospital supplied no evidence setting forth documents' relation to medical study activities).

Turning to the defendants' memoranda of September 4, 1998, and March 12, 1999, neither identify any specific documents as to which the privilege applies, nor do they indicate that the plaintiffs' discovery requests sought material related to a study of morbidity or mortality. Rather, the defendants' September 4, 1998 memorandum asserted solely that the documents requested by

the plaintiffs were nondiscoverable because they "originated from the infection control committee at [the hospital] and were composed for the purpose of infection control and quality control." The defendants' memorandum of March 12, 1999, although providing a more detailed objection to the plaintiffs' discovery request, asserted only that the plaintiffs were requesting documents that reflected data "used by the committee for very specific purposes; the improvement of the quality of care of patients and the reduction of morbidity and mortality," and that "infection control studies which specifically include studies performed in response to any rise in MRSA are studies conducted for the purpose of reducing morbidity or mortality."

In addition to failing to identify any particular document that reflected such a study, the defendants offered no factual support for their assertion that the reduction of morbidity or mortality was in fact the purpose of any study undertaken in response to a rise in the MRSA infection. It is insufficient for the party invoking the privilege to do so solely by way of factual assertions made by an attorney in a memorandum of law to the court. The assertion must be made by way of evidence, that is, by an affidavit of a person qualified to make the assertion or, in the event that an evidentiary hearing is held, by way of witness testimony. In addition, as noted previously, the hospital's infection control committee performs a number of infection control related tasks. A study involving infection control, therefore, is not necessarily primarily undertaken for the purpose of reducing morbidity or mortality. To say simply that a document is immune from discovery because it serves both a protected and unprotected function would undermine the purpose of the statute, which is generally to encourage the reduction of morbidity and mortality. This objective can be accomplished only by confining the statutory privilege to material generated principally

for that purpose. In this case, Baker's affidavit is simply too general and too sweeping to establish the necessary showing.

As to the defendants' April 15, 1999 memorandum, the assertions therein provide no factual basis whatsoever for concluding that the documents requested by the plaintiffs pertain to a "study of morbidity or mortality." The sole reference in that memorandum to the medical studies statute is the blanket assertion that the plaintiffs "seek information which is privileged and protected by [§§ 19a-17b and 19a-25] . . . ."

Regarding the defendants' remaining evidence, their privilege log enumerated ninety-one documents to which the defendants asserted confidentiality under § 19a-25. See footnote 9 of this opinion. As previously described, however, the log itself characterized each document in terms of its title, date of creation and procuring source, that is, the infection control committee. The log is devoid of any indication that the documents relate to a "study of morbidity or mortality" undertaken for the specific purpose of reducing instances of patient deaths. In fact, given the vagueness of the entries included therein, it cannot be discerned from the privilege log that the hospital has recorded even a single incident of patient death.

With respect to Baker's affidavit, the averments therein establish generally that the documents in question "are an integral part" of the infection control committee. The affidavit, however, includes no assertion regarding the nature or purpose for which the relevant documents were procured. Therefore, to accept the affidavit as sufficient to invoke the privilege would imply that the sole function of the committee is to conduct studies related to morbidity or mortality. Baker himself, however, attests to the many reasons for which the committee collects data, including "to gather and

review information relating to the care and treatment of patients for the purpose of evaluating and improving the quality of health care," and "establishing and enforcing guidelines designed to keep within reasonable bounds the cost of health care." Nothing in Baker's affidavit indicates, as the trial court concluded, that the infection control committee was not collecting such data "for purposes of comparison with other institutions, to track seasonal variations, or for other purposes other than reducing morbidity or mortality."

On the basis of our review of the defendants' memoranda, their privilege log and Baker's affidavit, we conclude that the trial court was within its discretion in determining that the defendants had failed to demonstrate the elements necessary to invoke the medical studies privilege. Consistent with our analysis above, a document is not immune from discovery by virtue of having been procured by a committee that engages in research related to morbidity or mortality. Rather, the documents themselves must have been generated primarily for such a study, and that study must have been undertaken for the particular purpose of reducing instances of morbidity or mortality.

Finally, for the reasons articulated in section I C of this opinion, we are unpersuaded that the trial court failed to provide the defendants with an adequate opportunity in which to establish under § 19a-25 the confidentiality of the documents in question. Nothing in the record indicates that the defendants objected to the scope of the trial court's inquiry. In particular, contrary to the defendants' assertion at oral argument, there is nothing to indicate that the defendants requested a hearing on the discovery issue. In this regard, we find it difficult to accept an indictment against the adequacy of the trial court's inquiry given that the defendants declined to accept the trial court's invitation to submit the allegedly privileged documents

for in camera inspection. Rather than submitting the documents for in camera review or offering competent testimony as to how the medical studies privilege applied, the defendants relied on generalized assertions that the documents in question were procured by an infection control committee that, in some capacity, seeks to reduce instances of morbidity and mortality. As the trial court noted, the defendants had from September, 1998, through April 15, 1999, to provide the court with a factual basis for their claims of privilege. The defendants should not now be permitted to compensate for the inadequacies of their own evidence.

### III

Finally, the defendant claims that the trial court abused its discretion in ordering the disclosure of privileged documents without specifically articulating the burden of proof the defendants were expected to meet and without allowing them a reasonable opportunity to meet that burden by either requesting additional affidavits or holding an evidentiary hearing. In this respect, the defendants urge that the trial court should have adopted the procedure set forth by the Supreme Judicial Court of Massachusetts in *Carr* v. *Howard*, supra, 426 Mass. 529–30.

The central issue in *Carr* was whether the confidentiality provisions of the Massachusetts peer review statute[19] precluded in camera review of certain documents to determine whether the privilege applied. According to the court, in camera inspection was not warranted under the circumstances because the defendant hospital, the party claiming the privilege, had produced sufficient evidence in the form of testimony and affidavits to show that the incident reports in question were protected under the statute. In reaching its decision, the

[19] See Mass. Gen. Laws c. 111, §§ 204, 205.

court in *Carr* set forth a two step approach for determining privilege claims pursuant to the relevant peer review statute. First, the trial court must examine the face of a discovery request in order to determine whether the records sought are within the scope of the statutory privilege. Id., 529. If such is the case, discovery is denied and further review is unwarranted. Second, if the discovery request is ambiguous, the burden shifts to the party asserting the privilege to offer "evidence of the way in which a given record was produced or how it was used." Id. Upon presentation of such evidence, the court should deny the request without resort to an in camera inspection, "particularly if the party seeking the allegedly privileged materials offers no reason to doubt a hospital's sworn statements." Id. Pursuant to this protocol, the Massachusetts court upheld the hospital's privilege claim, not because the plaintiff's requests sought privileged documents on their face, but, rather, because "[the hospital] had produced sufficient evidence to show that the . . . incident reports in question [met] the [peer review] requirements . . . ." Id., 531.

The defendants in the present case argue that had the trial court applied the *Carr* procedure, it would have granted their motion on the ground that the plaintiffs' discovery requests, on their face, seek protected material. In the alternative, the defendants claim that the evidence they produced in support of their motion adequately justified application of the claimed privileges.

Heretofore, we have not articulated the burden of proof scheme applicable to claims of privilege asserted under §§ 19a-17b and 19a-25. Nonetheless, with respect to privilege claims generally, we have held that where the confidential status of otherwise discoverable information is apparent, a claim of privilege may be disposed of without further inquiry. See *Ullmann* v. *State*, 230

Conn. 698, 714, 647 A.2d 324 (1994) (denying attorney-client privilege where state's offer of proof, "on its face," demonstrated that elicited testimony would not reveal client confidences). Where the nature of a document is not patently discernible from the face of the discovery request, however, the burden of establishing immunity from discovery rests with the party asserting the privilege. See *Wilson* v. *Freedom of Information Commission,* supra, 181 Conn. 341. That burden is discharged by the presentation of evidence in the form of testimony or affidavits concerning the document's content and use. See id., 340.

A number of jurisdictions have applied a similar burden of proof scheme to privilege claims asserted under a peer review or medical studies statute. These jurisdictions hold generally that once a party has made a prima facie request for relevant documents, the burden is on the party opposed to discovery to establish the existence of any applicable privilege. See, e.g., *Santa Rosa Memorial Hospital* v. *Superior Court,* supra, 174 Cal. App. 3d 727 ("the party claiming immunity from discovery carries the burden of showing that the evidence it seeks to suppress is within the terms of the statute it relies upon"); *Roache* v. *Springfield Clinic,* 157 Ill. 2d 29, 44–45, 623 N.E.2d 246 (1993) (placing burden of establishing applicability of peer review privilege on party seeking to invoke privilege); *Claypool* v. *Mladineo,* supra, 724 So. 2d 387 ("[t]he party or parties wishing to apply the privilege must prove that the particular committee in question comes within the purview of [the peer review statute]"); *State ex rel. Dixon* v. *Darnold,* supra, 939 S.W.2d 70 ("[w]here a [peer review] privilege is asserted and then challenged, the burden rests upon the party claiming the privilege to establish that the material is, in fact, not discoverable"); *Ballard* v. *Herzke,* 924 S.W.2d 652, 658 (Tenn. 1996) (party seeking

protective order bears burden of justifying confidentiality of each and every document sought to be protected); *In re Methodist Hospital*, 982 S.W.2d 112, 114 (Tex. App. 1998) ("[t]he party claiming [peer review] privilege bears the burden of producing evidence to support its contention that the documents in question qualify for the privilege"); *State ex rel. Shroades* v. *Henry*, supra, 187 W. Va. 728 ("party asserting the [peer review] privilege has the burden of demonstrating that the privilege applies").

In light of our own privilege jurisprudence and the well reasoned authority from other jurisdictions, we are persuaded that where the status of a document cannot be discerned from the face of a discovery request, under §§ 19a-17b and 19a-25, the party opposed to discovery has the burden of both asserting and establishing the applicable privilege. We read *Carr* as invoking a burden shifting scheme similar in approach.

The record indicates that the trial court, consistent with our own jurisprudence as well as with the Massachusetts court's decision in *Carr*, properly imposed upon the defendants the burden of establishing the documents' privileged status. Nothing in the plaintiffs' discovery requests seek information so clearly within the exclusive domain of peer review or a medical study of morbidity or mortality that the defendants' motion properly could have been granted without further judicial inquiry. See contra *Mt. Diablo Hospital* v. *Stella*, 183 Cal. App. 3d 30, 35, 227 Cal. Rptr. 790 (1986) (party's request for production of "minutes" properly denied without further review per statute that makes confidential "proceedings" of qualifying committee); *Santa Rosa Memorial Hospital* v. *Superior Court*, supra, 174 Cal. App. 3d 727 (discovery request for "self-generated analysis of the adequacy of work performed by hospital staff members" denied without further examination). The documents requested by the plaintiffs range in

nature from those that pertain to the rates of nosocomial infection, to those that constitute incident reports prepared in light of such an infection, to those that reflect hospital procedures or recommendations taken with respect to high risk patients. As we stated in part I C of this opinion, such information is relevant to a myriad of hospital functions and might very well be procured by various members of the hospital's medical or administrative staff.

In the lower court proceedings, the trial court did not expressly state that the broad content of the plaintiffs' discovery requests essentially shifted the burden to the defendants to assert and then establish any applicable privilege. That the court nevertheless declined to interfere with the discovery process until the defendants had had the opportunity to respond reflects its proper understanding to that effect. The defendants' response, however, came in the form of a motion for a protective order and objections to the plaintiffs' interrogatories in which the defendants asserted conclusorily that the documents were privileged pursuant to the peer review and medical studies statutes. Neither the defendants' motion nor their objections to interrogatories conveyed the nature or purpose of the documents in question. Nor did Baker's affidavit establish the critical elements necessary to invoke either the peer review or medical studies privilege. See parts I C and II C of this opinion.

Although the defendants had failed in their initial attempt to establish any applicable privilege, the trial court provided them with an opportunity to submit additional information. The trial court twice ordered the defendants to submit a detailed privilege log listing the claimed source of privilege. In addition, it provided the defendants with the option of submitting questionable documents for in camera review. The trial court thereafter issued its ruling based on the evidence that the defendants had submitted. We conclude, therefore,

that the burden of proof employed by the trial court is consistent with that which we hold applicable to claims of privilege under General Statutes §§ 19a-17b and 19a-25.

The judgment is affirmed.

In this opinion the other justices concurred.